FILED
EASTERN DISTRICT ARKANSAS
JUN 21 2011
JAMES W. McCORMACK, CLERK
By:_____ CLERK

"COVER PAGE"

"IN THE UNITED STATES DISTRICT COURT"
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

Allen Polk                                    Plaintiff

v.                    Case No: 4:11CV00501 BRW/JTR
                      This case assigned to District Judge Wilson
                      and to Magistrate Judge Ray

Pulaski County, et al                 Defendants
(State Agency/Entity),
F.G. "Buddy" Villines, III, (C.E.O., Pulaski County),
Doc Holladay, (Sheriff, Pulaski County),
Joe Gardner, (Lt., Head of Internal Affairs, P.C.S.O.),
Randy Morgan, (Chief of Detention, P.C.D.F.s),
Shawn Smith, (Major, Housing/Security and Intake Com-
mander, P.C.D.F.s), Ms. Brawley, (Sgt., Grievance
Officer, P.C.D.F.s), City of Little Rock, (Judicial Entity),
City of North Little Rock, (Judicial Entity), Mr. Stuart Thomas,
(Chief of Police, Little Rock P.D.), Mr. Danny Bradley, (Chief of Police,
North Little Rock P.D.) Mr. Blankenship, (Police Officer, N.L.R.P.D.)...

"COMPLAINT PERSUANT TO 42 U.S.C. §1983"

(i)

.. and (17) "John Doe" Police Officers (5 from N.L.R.P.D. and 12
from L.R.P.D.) working at the Northside Booking Facility of the P.C.
S.O. on Feb. 4, 2011 and Feb. 5, 2011; (See Ex.-H, attached).

# "TABLE OF CONTENTS"

I. STATEMENT OF FACTS — PAGE #1
II. CAUSE OF ACTION — PAGE #9
III. STATEMENT OF THE ISSUES — PAGE #10
IV. STATEMENT OF THE CASE — PAGE #11
V. STATEMENT OF CLAIM — PAGE #13
VI. RELIEF SOUGHT — PAGE #19
VII. STATEMENT OF NOTICE — PAGE #21
VIII. CONCLUSION — PAGE #22
IX. CERTIFICATE OF SERVICE — PAGE #24
X. ADENDUM — PAGE #25

## "WITNESSES TO BE SUBPOENAED"

#1.) Video Footage            #9.)
#2.) Sgt. V. Stricklin, P.C.D.F.   #10.)
#3.) Northside Sign-In Book.     #11.)
#4.) Ofc. M. Wood, N.L.R.P.D.   #12.)
#5.) All P.C.D.F. trusties on    #13.)
    ) duty Feb. 4-Feb. 5, 2011  #14.)
    ) @ Northside Bookin.       #15.)
#8.) All inmates incarcerated   #16.)
@ Northside Bookin on Feb. 4-Feb. 5, 2011.

(ii)

"IN THE UNITED STATES DISTRICT COURT"
EASTERN DISTRICT OF ARKANSAS
<u>WESTERN DIVISION</u>

Allen Polk                            Plaintiff

V.          Case No; _____

Pulaski County, et al        Defendants

<u>"COMPLAINT PERSUANT TO 42 U.S.C. § 1983"</u>

Comes Plaintiff, Allen Polk, (Polk), by and through
Agent, the undersigned, to bring a Complaint Persuant
To 42 U.S.C. § 1983²; and so states;

## I. STATEMENT OF FACTS

#1.) Movant, Polk, a citizen of L.R., Pulaski County,
Ark., U.S.A., for all times relevant to this complaint ³.

(I of 30)

1. See "Ex. "A", attached, and STATEMENT OF NOTICE @ page #21.
2. Notice is made for trial to a jury.
3. Time frame; <u>Feb. 4, 2011</u>     through <u>Feb. 5, 2011</u>   .

has been and now remains a pretrial detainee incarcerated within the Pulaski County Detention Facilities (P.C.D.F.) under the booking #1902-11, and he is available for service of pleadings, interrogatories, depositions, meetings, etc., during normal business hours at 3201 W. Roosevelt Rd., L.R., Ark., 72204.

#2.) Defendant PULASKI COUNTY (Pulaski Co.) for all times relevant to this complaint has been and now remains a STATE AGENCY/ENTITY (treated as a person for purposes of civil litigation) vested with the duty to house and protect all inmates delivered unto it by the various law enforcement agencies in a clean, safe, and secure [controlled] environment (typically in one of the P.C.D.F.'s) while in pretrial detention, serving misdemeanor sentences, or awaiting transfer post-conviction, and all administrative officials and employees there,

[2 of 30]

(at P.C.D.F., a subdivision of Pulaski County), contract or otherwise, are legally bound to facilitate the established norms found in the U.S. Constitution, the Constitution of the State of Ark., Fed. and State Laws, Codified Admin. Procedure, and the Policies and Rules found in the Inmate Handbook.[4] Moreover, all of these guidelines must be adhered to in a consistent fashion, respectively, from superseding to subordinate, carried out in a uniform manner by all obligated parties, and they may not be ignored or arbitrarily "side-stepped" by anyone in order to insure ethical conduct by staff and the humane treatment of inmates, and Defendant Pulaski County is available for service at 201 Broadway St., L.R., Ark., 72201.

#3.) Defendant F.G. "BUDDY" VILLINES, III, (Villines), for all times relevant to this complaint has been and now remains the Chief Executive Officer for Defendant Pulaski County, and in his official capacity as such, he is responsible, inter alia,

[3 of 30]

[4] See Ex.-B, attached; Inmate Handbook.

for insuring that compitant and responsible
admin. personel and other staff are on hand
and available at both the Pulaski County Sheriffs
Office (P.C.S.O.); which holds direct oversight
authority over the various P.C.D.F.'s; and the
P.C.D.F.'s themselves, so that the Constitutional
Rights of inmates held to custody are not violated,
and he is available for service during normal business
hours at 201 S. Broadway St., L.R., Ark., 72201.[5]

#4.) Defendant DOC HOLLADAY (Holladay),
for all times relevant to this complaint has been and now
remains the SHERIFF for Defendant Pulaski County,
and in his official capacity as such he is responsible,
inter alia, for insuring that compitant and responsible
admin. personel and other staff are on hand and available
at both the P.C.S.O. and the P.C.D.F.'s themselves,

[4 of 30]

5. Defendant Villines has superior decision making
authority, to all other named Defendants and he is
sued in his personal and official capacity as "C.E.O."
of Pulaski County only; this complaint in no way relates
to Defendant Villines' capacity as a Judicial Officer.

so that the Constitutional Rights of inmates held in custody are not violated, and he is available for service during normal business hours at 2900 S. Woodrow St., L.R., Ark., 72204. [6.]

#5.) Defendant JOE GARDNER (Gardner), for all times relevant to this complaint has been and now remains a LIEUTENANT for the P.C.S.O. in charge of INTERNAL AFFAIRS, and in his official capacity as such, he is responsible, inter alia, for the fair and unbiased investigation of complaints against any staff member of either the P.C.S.O. or the various P.C.D.F.s; Defendant Gardner has superior oversight authority to all forthcoming named Defendants, is obligated to prevent and/or stop violations of inmates Constitutional Rights, and he is available for service during normal business hours at 2900 S. Woodrow St., L.R., Ark., 72204.

[5 of 30]

[6.] Defendant Holladay has superior decision making authority to all forthcoming named Defendants and is ultimately responsible for all matters at the P.C.S.O. and P.C.D.F.s.

#6.) Defendant RANDY MORGAN (Morgan), for all times relevant to this complaint has been and now remains the Chief of Detention for the P.C.D.F.s, and in his official capacity as such, he is responsible, inter alia, for investigating and making final decisions on inmate grievances in the administrative remedy process; he also has superior oversight authority to all forthcoming named Defendants, is obligated to prevent and/or stop violations of inmate's Constitutional Rights, and is available for service during normal business hours at 3201 W. Roosevelt Rd., L.R., Ark., 72204.

#7.) Defendant SHAWN SMITH (Smith), for all times relevant to this complaint has been and now remains the MAJOR for the P.C.D.F.s with the job description of HOUSING/SECURITY and INTAKE COMMANDER, and in his official capacity as such, he is responsible, inter alia, for investigating and making final decisions on inmate grievances (only

[6 of 30]

Defendants Morgan and Smith are authorized to make such "final" administrative decisions for the P.C.D.E.'s) in the administrative remedy process; he also has superior oversight authority to all forthcoming named Defendants, is obligated to prevent and/or stop violations of inmate's Constitutional Rights, and is available for service during normal business hours at 3201 W. Roosevelt Rd., L.R., Ark., 72204.

#8.) Defendant NANCY BRAWLEY (Brawley), for all times relevant to this complaint has been and now remains a SARGENT for the P.C.D.E.'s, she has the job description, among others, of GRIEVANCE OFFICER, and in her official capacity as such, she is responsible, inter alia, for investigating and making preliminary decisions on inmate grievances in the administrative remedy process; by virtue of her position, she has superior oversight authority to all forthcoming named Defendants, is obligated

[7 of 30]

to prevent and/or stop violations of inmate's Constitutional Rights, and she is available for service during normal business hours at 3201 W. Roosevelt Rd., L.R., Ark., 72204.

#9.) Jurisdiction and venue are properly laid before this court as all parties relevant to the instant complaint are located within the Eastern District of Arkansas, and jurisdiction is in *personum*.

#10.) Polk has filed no previous lawsuits in any court behind the specific issues cited in this complaint, which are factually distinct as to Defendants, location, and time frame.

#11.) Polk has been in the custody of the P.C.D.I.'s various "holding areas" either in General Population, on Administrative Segregation (Ad. Seg.) status, and/or on Punitive Isolation status while awaiting the

(8 of 30)

disposition of pending state criminal charges in Pulaski Circuit - 60-CR-11-955 throughout the entire course of the time frame encompassing the incidents at bar, and all possible administrative remedies have been thoroughly exhausted via oral argument, formal demand letter, and/or grievances, all of which were side-stepped, patently ignored, and/or deemed "NON-GRIEVABLE"[7]. (See Exhibits B-H, attached).

#12.) Additional Defendants, if applicable, will be named in an Addendum to this complaint.

## II. CAUSE OF ACTION

The Defendants, jointly and severally, have a long and sordid history of blatant non-compliance with the previously issued mandates of this court, and they flagrantly disregard all verbal and/or written grievances

$$\boxed{9 \text{ of } 30}$$

[7] Multiple examples available upon request. Use of the P.C.D.F. grievance procedure is N/A in this issue, but one was filed on the incident, anyway, requesting names of all employees working at Northside on Feb. 4 - Feb. 5, 2011, + it was not returned.

and/or requests for cooperation on ANY ISSUE of an important nature brought to their attention by your Movant; likewise, they display a constant and perpetual level of inattention to PLAIN ENGLISH that is literally comparable to talking to a "STOP" sign, thus outside intervention has again become a necessity in order to compel compliance and cooperation via Court Decree.

## III. STATEMENT OF THE ISSUES

The issue is whether Defendants violated P.Sk.'s 8th & 14th Amendment civil Rights by refusing to allow him to shower to remove a chemical agent used on him during his arrest, subjecting him to a variety of inhumane conditions of confinement such as inadequate bedding and no running water while housed in two seperate holding cells at Northside Bookin for appx. (14) hours, and using excessive force against him by deliberately cuffing him in a cruel & unusual manner for appx. (8) of the above referanced (14) hour period of time (estimated at about 10 of 30) 5:00 am. - 1:00 pm on 2/5/11), exclusive of all other similarly situated inmates incarcerated at Northside between appx. 11:00 pm on 2/4/11 and 1:00 pm on 2/5/11, causing P.Sk.'s to suffer injuries ranging from extreme emotional stress and anxiety to excruciating pain inflicted by torture simply because he kicked a door and DEMANDED WATER.

# IV. STATEMENT OF THE CASE

On Feb. 4, 2011, Polk was arrested on state charges including Theft of Property, Resisting Arrest, etc. (Pulaski County Circuit #60-CR-11-355) and was transported to Northside Booking by Def. Blankenship at appx. 10:30 pm. or 11:00 pm.

A chemical agent believed to be O.C. Spray had previously been used on him by another Officer, and which Polk was treated by someone at the N.L.R.P.D. to wash some of the O.C. Spray out of his eyes, upon arrival at Northside, Def. Blankenship allowed Polk only a few minutes at a sink with no soap to try to wash off all the rest of the spray before forcing him to resume the booking process, even though Polk repeatedly objected to not being allowed to wash the chemical off and requested a shower, which was also denied.

Polk was then placed in a cell with no running water other than a Toilet; i.e.— no drinking water, soap and water to wash with, or shower — and no blanket, sheets, or mattress was ever provided, even though Polk had to spend the night there, and was not transported to the main jail until appx. (14) hours later.

Because Polk's eyes, face, head, ears, nose, lips, throat, neck, back, arms, and hands were all still burning pretty bad from the "hosing down" he got prior to arrest and because he was extremely thirsty, he repeatedly [ 11 of 30 ] asked the Officers on duty for access to water, and was only allowed out of the cell once (briefly) at around 1:00 am to drink from the water fountain, then returned, and not allowed to take any water back to the cell with him; soon he was intolerably thirsty again.

Polk had been held in that cell (described in 2-X-4) for appx. (6) hours by this time, (5:00 am) and because his repeated requests for water were being ignored, he began kicking the cell door, and after a while, a couple of the Officers on duty (listed as "John Doe" Defendants) removed him from the cell, but rather than allowing him access to water, they placed him in a different cell and forced him to submit to being hand-cuffed behind his back, cuffed at the ankles, (both ankle & wrist cuffs were sinched down "WAY TO TIGHT" and quickly cut off the circulation in both Polk's hands and feet) and then put on the floor of the cell he was put in "by himself" in a "VERY ANKWARD AND PAINFUL" position with another set of cuffs (or a chain with attachments of some sort) hooking the hand-cuffs on his wrists and the cuffs on his ankles together so that both sets of overtightened restraints pulled against eachother, causing EXCRUTIATING, MIND-TWISTING PAIN, and even after he began SCREAMING FOR HELP AND PLEADING WITH THEM TO TAKE THE CUFFS AND CHAINS OFF, they "IGNORED HIM" and left him in them to suffer like that IN AGONY for what seemed like appx. (8) hours, until a North Little Rock P.D. Transport Officer by the name of "M. HOOD" finally showed up at about 1:00 pm, made them take the restraints off, and got Polk out of there, and all that was done to [ 12 of 30 ] Polk SIMPLY BECAUSE HE WANTED WATER! It was barbaric and nothing but "TORTURE" caused pain impossible to fully describe. (See also page 30 of this complaint in the Addendum) It's impossible to determine whether the restraints feeling like they were about to cut off his hands & feet was worse or the muscle cramps or what!

# V. STATEMENT OF CLAIM

Pursuant to Fed. R. Civ. P., Rules 8(a), (e) and 10(b), listed below in each numbered count is a short and plain statement of simple, concise, and direct averments showing Polk is entitled to the relief sought, and demand for judgement for said relief on each count is hereby formally made.

Count #1.) Because Defendant Pulaski County, (which ultimately owns and operates all subdivisions of itself, including the P.C.S.O. and the P.C.D.F.s) by and through its several Officers, Administrative Officials, and other Personel, while forcibly holding Polk to custody in its various P.C.D.F.s, failed to designate and assign adequately trained and competant Personel who were willing and able to prevent and/or stop the violation of Polk's substantive civil rights, this Defendant has by deliberate indifference, negligence, and/or reckless disregard proximately enabled and/or caused the violations to occur, to wit; Defendant violated Polk's 8th & 14th Amend. Civil Rights under the U.S.C. by refusing him a shower, bedding materials, and running water to drink post arrest and by subject- ing him to unlawful restraint amounting to torture, (all as described herein), causing the injuries of severe physical pain, emotional stress, and anxiety, all /13 of 30/ because he wanted some water and kicked a steel door and demanded some.

Count #2.) Because Defendant Villines, (whom as C.E.O. for Defendant Pulaski County holds principal oversight authority on, and is ultimately responsible for, the day to day operations of subdivisions P.C.S.O. and the P.C.D.E.s) by and through his subordinate Officers, Administrative Officials, and other Personel, while forcibly holding Polk in custody in said P.C.D.E.s, failed to designate and assign adequately trained and compitant Personel, who would have been willing and able to prevent and/or stop the violation of Polk's substantive civil rights, this Defendant has by deliberate indifferance, negligence, and/or reckless disregard proximately enabled and/or caused the said violations to occur, to wit; the violated Polk's #s in this same right by refusing him a shower, bedding materials, & running water to drink post arrest & by subjecting him to unlawful restraint amounting to torture as described herei, causing the injuries of severe pain, emotional stress & anxiety, all because he wanted some water & kicked a stall door demanding some.

Count #3.) Because Defendant Holladay, (whom as Sheriff for Defendant Pulaski County holds primary oversight authority on, and is directly responsible for, the day to day operations of subdivisions P.C.S.O. and

14 of 30

the P.C.D.E.s), by and through his subordinate
Administrative Officials and other Personel, while
forcibly holding Polk to custody in said P.C.D.E.s,
failed to designate and assign adequately trained and
competant Personel who would have been willing
and able to prevent and/or stop the violation of
Polk's substantive civil rights and ignored written
requests to investigate and do it himself, this Defendant
has by deliberate indifferance, negligence, and/or
reckless disregard proximately enabled and/or
caused the said violations to occur, to wit; Def. violated
Polk's 8ᵗʰ+14ᵗʰ Amnd Rights by refusing him a shower, bedding materials, and
running water to drink post arrest and by subjecting him to unlawful restraint
amounting to torture (as described herein) causing the injuries of severe
physical pain, emotional stres + anxiety, all because he wanted some water
and kicked a stuf ovr. and demanded sme.

Count #4.) Because Defendant Gardner,
(whom as a Lieutenant directly in charge of the
Internal Affairs division of the P.C.S.O., which
is also obligated to investigate complaints arising
from within its affiliated subdivisions the P.C.D.E.s
upon formal request to do so), by and through
his subordinate staff and Personel, ignored

/15 of 30/

multiple written requests to investigate the numerous allegations of violations of Polk's substantive civil rights by the designated Administrative Officials and Personel forcibly holding Polk in custody within said P.C.D.E.s, this Defendant has by deliberate indifferance, negligence, and/or reckless disregard proximately enabled and/or caused the said violations to continue to occur, To wit, Def. violated Polk's 1 & 2 14th Amend. Rights by refusing him a shower, brushing materials, & running water to drink post arrest & by subjecting him to unlawful restraint amounting to torture as described herein, causing the injuries of severe pain, emotional stress & anxiety, all because he wanted some water & kicked a stall door and demanded some.

Count #5.) Because Defendant Morgan, (whom as Chief of Detention for the P.C.D.E.s) by and through his subordinate Staff and Personel, chose to ignore multiple written requests to investigate the numerous allegations of violations of Polk's substantive civil rights by his fellow Administrative Officials and subordinate Staff and Personel, while forcibly holding Polk in custody within said P.C.D.E.s, this

16 of 30

Defendant has by deliberate indifference, negligence, and/or reckless disregard proximately enabled and/or caused the said violations to continue to occur, to wit; Def. violated Polk's 8th & 14th Amend. Rights by refusing him a shower, bedding materials, & running water to drink post arrest & by subjecting him to unlawful restraint amounting to torture as described herein, causing the injuries of severe pain, emotional stress & anxiety, all because he wanted some water & kicked & stated same & demanded same.

Count #6.) Because Defendant Smith, (whom as a Major for the P.C.D.E.'s in charge of Housing/Security and Intake), by and through his subordinate staff and Personel, chose to ignore multiple written requests to investigate the numerous allegations of violations of Polk's substantive civil rights by his fellow Administrative Officials and subordinate staff and Personel, while forcibly holding Polk to custody within said P.C.D.E.'s, this Defendant has by deliberate indifferance, negligence, and/or reckless disregard proximately enabled and/or caused the said violations to continue to occur, to wit; Def. violated Polk's 8th & 14th Amend. Rights by refusing him a shower, bedding materials, & running water to drink post arrest & by subjecting him to unlawful restraint amounting

(17 of 30)

to torture as described herein, causing the injuries of severe pain, emotional stress & anxiety, all because he wanted some water and kicked a steel door & demanded some.

Count #7.) Because Defendant Brawley, (whom as a Sargent directly in charge of the administrative remedy process; i.e. - the Grievance Officer — for the P.C.D.F.s), chose to "side-step", ignore, and/or "rubber-stamp" multiple grievances as "NON-GRIEVABLE" and/or block the administrative remedy process by either drawing lines (such as "//") through the "Inmates Appeal" and "Appeal Response" sections of the forms or refusing to process and return grievances entirely, and because those grievances constituted multiple written requests to investigate the numerous allegations of violations of Polks substantive civil rights by her fellow Staff Members and subordinate Personnel, Defendant has by deliberate indifference, negligence, and/or reckless disregard proximately caused the violations, to wit; Dfn. violated Polks 8th, 14th Amnd. Rights by refusing him a shower, bedding materials, and running water to drink post arrest & by subjecting him to unlawful restraint amounting to torture as described herein, causing the injuries of severe pain, emotional stress & anxiety, all because he wanted some water & kicked a steel door and demanded some.

[18 of 30]

Note; Continued claims, if applicable, located in Adendum.

# VI. RELIEF SOUGHT

Defendants are sued individually and severally, personally and officially, all acted under color of state law, all owe Polk the below listed cash and other damages and awards, pro rata, Movant is entitled to it as a matter of law, and formal demand is hereby made for same immediately, in full, and in cash; (Fed. R. Civ. P., Rules 8(a)(2) &(3)).

#1.) Award Polk $5,000.00/Day punitive damages and $1,000.00/Day compensatory damages from "EACH DEFENDANT" for "EACH DAY" he was subjected to the cited violations.

#2.) Award prevailing attorney's fees and costs; (Fed. R. Civ. P., Rule 54(d)).

#3.) Issue an Order instructing Defendants

[19 of 30]

to immediately cease and desist the actions, behavior, and conduct that caused the cited violations to occur and not to resume said actions, behavior, and conduct at any point in the future.

#4.) Order an IMMEDIATE Internal Affairs Investigation be conducted, with all video, audio, and written records secured and made available to Plaintiff upon discovery request.

#5.) Place all Police Officers directly connected to the torture described herein on Administrative leave without pay pending the results of the Investigation and then fire them all after its complete.

#6.) Order the Northside Booking Facility to permanently closed and scheduled for demolition.

# VII. STATEMENT OF NOTICE

Pursuant to Fed. R. Civ. P., Rules 10(c) and 25(c), as this "STATEMENT" OF NOTICE may be adopted by reference and, "A copy of any written instrument which is an exhibit[8] to a pleading is a part thereof for all purposes." sic —, Polk reserves the right to add additional Defendants (or to drop existing Defendants) for good cause shown upon a motion to the court, to divest interest in all or part of this complaint via standard U.C.C. Contract at any point in time deemed responsible enough to prosecute the claim to fruition for a single lump sum payment from said third party to Polk in an amount yet to be determined, to proceed in absentia via yet to be determined counsel of record from commencement to final ruling in the case, (unless specifically ordered to appear in person), and all Constitutional Amendments cited (and any not cited that apply) are claimed and incorporated by reference within the text of this complaint throughout, in the foregoing and the forthcoming, as the text also constitutes the intent behind the claims. All factual issues cited and claims made herein both avail themselves to and vigorously allude to common questions of law, and while the issues and claims found herein are separate and distinct from those brought in any other complaint, one or more "exhibits" to this complaint may by necessity be

8. See "EX.-A", attached.                    [21 of 30]

attached to more than one complaint. Polk is acting in the capacity of an Agent (by and for himself) for the purpose of prosecuting this complaint and receiving substantial collateral legal assistance from certified and licensed legal support firms, and in the event that the intent behind this position may otherwise have been unclear, all laws of the United States and the State of Arkansas will be respected and complied with, and the capacity legally assumed by Movant specifically "DOES NOT" convey any affiliation with or allegiance to any "sovereign" movement/nonsense. LEGAL SUPPORT VEHICLE ONLY.

## VIII. CONCLUSION

Polk believes he has adequately shown a willful and reckless disregard for his Constitutional Rights, and the Defendants should therefore be held accountable for their actions (or lack thereof, as the case may be) in a way that both solves the problem and sends a strong message that such egregious conduct will not be tolerated on pain of insolvency.

22 of 30

Wherefore, Polk prays this Honorable
Court will find in his favor, awarding all
the relief sought, and for all other good and
equitable remedy deemed just and proper
per positivistic jurisprudence.

Respectfully Submitted, Allen Polk
Agent/Attorney In Fact
P.C.J. #1902-11
3201 W. Roosevelt Rd.
Little Rock, Arkansas
72204
501-340-7006

State of Arkansas - - - )
                        ) ss
County of Pulaski - - . )

/23 of 30/

# IX. CERTIFICATE OF SERVICE

I certify the foregoing shall have been mailed to Diane Peske, Pro Se Clerk, Richard Shepard Arnold Federal Courthouse, 600 W. Capitol Avenue, A-149, Little Rock, Arkansas, 72201, on or about _June 20_____, 2011.

Allen Polk

AP/ap
Encls _ _ _ _ _ _ )
Cc; File _ _ _ _ _ )

24 of 30

# X. ADENDUM

All additional named Defendants not previously listed in the Statement Of Facts are listed and described below, to wit;

**#8.)** Defendant City of Little Rock, (L.R.), at all times relevant a JUDICIAL ENTITY responsible to insure its employees & their subordinates refrain from violating the Constitutional Rights of inmates under their supervision, is available for service at 500 W. Markham St., L.R., Ark. 72201; Def. L.R. is responsible for the conduct of its people.

Claim Count #8.) By proxy, Def. L.R. violated Pltf's 8th & 14th Amend. Rights by refusing him a shower, bedding materials, & running water to drink post arrest & by subjecting him to unlawful restraint amounting to torture as described herein, causing the injuries of severe physical pain, emotional stress & anxiety, all because he wanted some water and kicked a steel door and demanded some.

**#9.)** Defendant Mr. Stuart Thomas, (Thomas), at all times relevant the CHIEF OF POLICE for Def. L.R., is responsible to insure that ⌐25 of 30⌐ his subordinate staff refrains from violating the Constitutional Rights of inmates under their supervision, and he is available for service at 700 W. Markham St., L.R., Ark., 72201; Def. Thomas is responsible for the conduct of his subordinate staff.

Claim Count #9.) Def. Thomas violated Polk's 8th & 14th Amend. Rights by refusing him a shower, bedding materials, and running water to drink post arrest & by subjecting him to unlawful restraint amounting to torture as described herein, causing the injuries of severe physical pain, emotional stress & anxiety, all because he wanted some water and kicked a steel door and demanded some.

#10.) Defendant City Of North Little Rock, (N.L.R.) at all times relevant a JUDICIAL ENTITY responsible to insure that its employees and their subordinates refrain from violating the Constitutional Rights of inmates under their supervision, is available for service at 300 Main Street, N.L.R., Ark., 72114; Def. N.L.R. is responsible for the conduct of its people.

Claim Count #10.) By proxy, Def. N.L.R. violated Polk's 8th & 14th Amend. Civil Rights by refusing him a shower, bedding materials, and running water to drink post arrest and by subjecting him to unlawful restraint amounting to torture as described herein, causing the injuries of severe physical pain, emotional stress & anxiety, all because he wanted some water and kicked a steel door and demanded some.

26 of 30

#11.) Defendant Mr. Danny Bradley, (Bradley), at all times relevant the CHIEF OF POLICE for Def. N.L.R., is responsible to insure that his subordinate staff refrains from violating the Constitutional Rights of inmates under their supervision, and he is available for service at 200 W. Pershing Blvd., N.L.R., Ark., 72114; Def. Bradley is responsible for the conduct of his subordinate staff.

Claim Count #11.) Def. Bradley violated Polk's 8th and 14th Amnd. Rights by refusing him a shower, bedding materials, and running water to drink post arrest & by subjecting him to unlawful restraint amounting to torture as described herein, causing the injuries of severe physical pain, emotional stress & anxiety, all because he wanted some water and kicked a steel door and demanded some.

#12.) Defendant Mr. Blankenship, (Blankenship), at all times relevant a POLICE OFFICER for Def. N.L.R., is responsible not to violate the Constitutional Rights of inmates both in his custody and under his supervision, and he is available for service at 200 W. Pershing Blvd., N.L.R., Ark., 72114.

(27 of 30)

Claim Count #12.) Def. Blankenship violated Polk's 8th & 14th Amend. Civil Rights by refusing him a shower, bedding material, and running water to drink post arrest & by subjecting him to unlawful restraint amounting to torture as described herein, causing the injuries of severe physical pain, emotional stress & anxiety, all because he wanted some water and kicked a steel door and demanded some; Def. personally "did it."

#13.) Twelve (12) "John Doe" Defendants, (cumulatively, the "L.R. Does") at all times relevant have been employed as POLICE OFFICERS for Def. L.R. assigned to work at the Northside Booking Facility on Feb. 4, 2011 - Feb. 5, 2011, whom are responsible not to violate the Constitutional Rights of inmates both in their custody and under their supervision, are all available for service at 700 W. Markham St., L.R., Ark., 72201, and their actual names will be ascertained upon discovery.

Claim Count #13.) All (12) L.R. Doe Defendants (if they were present at Northside on 2/4/11 - 2/5/11) violated Polk's 8th & 14th Amend. Civil Rights by refusing him a shower, bedding materials, and running water to drink post arrest

28 of 30

and by subjecting him to unlawful restraint amounting to torture as described herein, causing the injuries of severe physical pain, emotional stress & anxiety, all because he wanted some water and kicked a steel door and demanded some; these Defendants personally "did it", either hands-on or by witnessing coworkers doing it and not stopping it.

#14.) Five (5) "John Doe" Defendants, (cumulatively, the "N.L.R. Does"), at all times relevant have been employed as POLICE OFFICERS for Def. N.L.R. assigned to work at the Northside Booking Facility on Feb. 4, 2011 - Feb. 5, 2011, whom are responsible not to violate the Constitutional Rights of inmates both in their custody and under their supervision, are all available for service at 200 W. Pershing Blvd., N.L.R., Ark., 72114, and their actual names will be ascertained upon discovery.

Claim Count #14.) All (5) N.L.R. Doe Defendants (if they were present at Northside on 2/4/11 - 2/5/11) violated Polk's 8th & 14th Amend. Civil Rights by refusing him a shower, bedding materials, and running water to drink post arrest and by subjecting him to unlawful restraint amounting to torture as described herein, causing the injuries of severe physical pain, emotional stress & anxiety, all because he wanted some water and kicked a [ 29 of 30 ] steel door and demanded some; these Defendants personally "did it", either hands-on or by witnessing coworkers doing it and not stopping it.

_STATEMENT OF THE CASE CONTINUED;_ Although the physical pain from this ordeal was so intollerable it caused Polk to fade in and out of consciousness and lose track of the actual duration of the overall incident, (Video footage and other documentation should clarify that), the physical pain eventually stopped after about 1-2 days, but the emotional pain and suffering Polk endured in the form of dispiration and the absolute belief at the time that "AT LEAST" his hands and feet were likely going to have to be amputated due to the swelling, stinging, and then eventually the "DEAD FEELING" in them from lack of blood circulation (IF HE LIVED THROUGH IT AT ALL) are all "PERMANENT MENTAL SCARS" that will never go away. Polk, in fact, now has a SERIOUS ISSUE with being put in shackles & chains FOR ANY REASON and FOR ANY LENGTH OF TIME that could very well lead to more problems in the future.

It is also believed that the Defendants may have done these things to Polk because they were mad about the offense he was charged with, which [30 of 30] is related to the alleged theft of a "N.L.R. Police Car", but even if Polk was guilty, WHICH HE IS NOT, that would not justify such conduct. NOTE: The issue of Officer Jay D. Goody using excessive force and actually employing the use of the chemical agent in the first place will be brought in a separate complaint. This complaint deals "ONLY" with what happened during the roughly (15) hours "AFTER" Polk was taken into custody.

**POWER OF ATTORNEY**

**KNOW ALL MEN BY THESE PRESENTS:**

That I *Allen Polk* of *Little Rock*, State of Arkansas do hereby appoint *Allen Polk* SSN: _____ -8801 State of Arkansas as agent and attorney in fact for me in my name to act Jointly of separately and to conduct all of my affairs, both personal and business, to sign all documents, to execute all contracts on my behalf, to demand, collect and receive all money due to me, to institute any suits, actions, and /or proceedings on my behalf, to partition and divide my estate and to do and perform all such matters as may be necessary and expedient for the purpose of caring out the objects above mentioned: and hereby ratify and confirm that said agent may do in said premises.

Specific instructions: *The Agent is a legally recognized & separate entity.¹ This instrument is unilaterally executed; grants total and complete discretion in its scope, is irrevocable, is Noticed to the U.S. District Ct., Eastern Dist of Ark., fully indemnifies all parties acting is adu its and it authorizes the above appointed Agent to conduct all business, collect all fees and costs, negotiate offers of compromise, and obtain relief in any criminal or civil matter on behalf of Allen Polk.*

*Allen Polk, pro se.*
Signature of Petitioner

¹ *A legal D.B.A./Alias; Id. - Liscense to practice law not required.*

Witness my hand and seal on this ___7TH___ day of __APRIL__ 2011
**STATE OF ARKANSAS)**
                    )ss
**COUNTY OF PULASKI)**
Subscribed and sworn to before me, a Notary Public this 7TH day of __APRIL__ 2011

My Commission Expires: 06/23/20

_Diane Green_
**Notary Public**

*"Ex.-A"*

*[1 of 1]*

*See F. R. Civ. P., Rule 10(c).*       *See Also 4:11-CV-385-JMM-JJV*

OFFICIAL SEAL - #12377352
DIANE GREEN
NOTARY PUBLIC-ARKANSAS
PULASKI COUNTY
MY COMMISSION EXPIRES: 06-23-20

# PULASKI COUNTY SHERIFF'S OFFICE
# REGIONAL DETENTION FACILITY



**Doc Holladay**
Sheriff

**Randy Morgan**
Chief of Detention

**Shawn Smith**
Housing/Security and Intake Commander

# Inmate Handbook

*Ex. -B*

Page 1    Rev. January 2009

# PULASKI COUNTY
# REGIONAL DETENTION FACILITY
# STATEMENT OF PHILOSOPHY

The mission of the Pulaski County Detention Facility is to provide for the just and humane care of all persons confined to the facility. The goals of the facility are, as follows: protection of the public; assistance to the judicial system; promotion of positive behavior; and, just and humane care of all inmates. To the extent possible, the facility will comply with state and national standards for the operation and management of adult local detention facilities and community residential programs, as well as all applicable local, state and federal laws, regulations, and codes. The Pulaski County Detention Facility should be considered a regional resource, serving the needs of those residing in the jurisdiction of Pulaski County.

The detention facility is designed and operated using the *direct supervision* concept of detention facility management. To facilitate this nationally recognized type of management style, all detention facility staff have been extensively trained to promote interaction with inmates and to structure the environment so that the critical needs of all persons confined to the facility are best met through compliant behavior. Your cooperation and compliance with the rules and regulations of the facility will help to achieve the goals and objectives of the facility and to ensure that the direct supervision concept of management is upheld.

## CLASSIFICATION

The classification process begins immediately upon your admission to the facility. To promote the direct supervision concept of management, the facility has developed and implemented a "behavior oriented" classification system. What this means is that your housing assignment will be based primarily on your past behavior and other factors that have been shown to predict what your behavior may be like during your confinement. This type of classification system groups inmates with similar behavior together in an effort to promote a positive environment throughout the facility. The classification system used at the Pulaski County Detention Facility breaks offenders down into four categories. When you are first admitted to the facility you are automatically placed in Level 3 new admission status. A description of the classification process and these levels follows. If you have any questions regarding any of the information contained in this section, refer them to your classification caseworker.

## INITIAL HOUSING/CLASSIFICATION ASSIGNMENT

During this 72 hours, you will be re-interviewed by classification personnel and your behavior will be observed by trained staff so that a determination can be made as to what housing unit and classification level you should be assigned. The classification caseworker assigned to your case will be responsible for making a recommendation to the Classification Board as to what your first housing assignment should be. The Classification Board is a group of staff appointed by the Chief of

Detention to review/approve all classification decisions. Once the Board has approved your first housing assignment, you will be classified to one of the following levels:

**Level 1:**   Inmates in this category are generally approved for work assignments. These inmates have the most privileges and movement throughout the facility.

> Level 1 sub-groups, are:

> Level 1.0:   Inmates able to work unsupervised outside of the facility (for example, public works). Committed inmates only.
> Level 1.1:   Inmates able to work unsupervised inside the secure perimeter of the facility or supervised outside of the secure perimeter.
> Level 1.2:   Inmates able to work inside the facility and only under the direct supervision of staff. Inmates that are not committed but have volunteered to work.

**Level 2:**   "General population" no behavior problems. Inmates who function well in groups and are not considered security risks. These inmates can qualify for work status and have the most privileges and movement in level 2 sub-groups.

> Level 2.0:   General Population level. These Inmates have no behavior problems.

> Level 2.1:   General population inmates with medical concerns.

> Level 2.2:   General population inmates with U.S. Marshal or Pen holds.

> Level 2.3:   Inmates that are eligible for work status but they decline.

**Level 3:**   New admission status

> Level 3.0   New inmates not classified

**Level 4:**   Inmates with special needs are in segregation status. The letter "M" indicates the inmate is on medical segregation. The letter "R" indicates the inmate is on restraint status.

> Level 4.0:   Inmates on protective custody.
> Level 4.1:   Inmates on administrative segregation ( 4.1M, 4.1R )

> Level 4.2:   Inmates serving disciplinary sentences.

Upon assignment to a classification level, you may be moved from your intake-housing unit to a new unit. In some cases, your housing assignment will not change and you will remain in the intake-housing unit.

# RECLASSIFICATION

Your classification caseworker will review your behavior every 30 days. Although not guaranteed, you will be more favorably considered for reclassification to a less restrictive level if you maintain good behavior, follow all facility rules and regulations, and participate in programs and services recommended to you by your caseworker or by staff. Likewise, you can be reclassified to a more restrictive level if you exhibit bad behavior, violate the rules and regulations, or are felt to be a threat to yourself, others or the facility. Reclassification to a more restrictive custody level can occur at your scheduled reclassification or at any time your behavior warrants. Appeals will be made by the use of a classification appeal form from your unit deputy.

# CELL CONDITIONS

There will be proper illumination of each cell and other areas where inmates may be held. There will be adequate heating in cold seasons and there shall be adequate ventilation at all times. There will be hot and cold water for bathing in accordance with the standards for public institutions, as well as adequate sanitary supplies of drinking water. There will be adequate working toilets and all leaks in plumbing will be repaired immediately. You are required to maintain your room in a clean and orderly manner at all times.

# HEALTH SERVICES

The Pulaski County Detention Facility provides for 24-hour medical care for all persons confined to the facility, seven days per week. Health care services include routine and emergency medical care, dental care, and mental health care services. A physician will be available on call at all times. Every inmate must receive a medical screening within 24 hours of intake. Arkansas State law allows the facility to collect some reimbursement for any medical services you receive at the facility. The detention facility has established the following rate schedule:

**Sick Call**      $5.00      (with either a nurse or dentist)

Any payments will be set aside in your personal fund account but will not be withdrawn until you have been convicted of an offense by a court of criminal jurisdiction. **You will not be denied health care based on your ability to pay. All inmates will be provided the same level of care.**

# SICK CALL PROCEDURES

You can request to see a health care professional for a valid, medical complaint. To do this you must complete a Health Services Request Form and place it in the sick call lock box located in your housing unit. It will be picked up by a member of the health care staff daily and will be reviewed to determine if you need to be seen by a health care specialist. Your request for service will be addressed within 24 – 72 hours

## MEDICATION

If you have been prescribed medication it will be administered to you at the required times by a member of the health care staff. You will be informed by a member of the health care staff as to the procedures you need to follow to be provided your medication. You will be required to take your medication in the presence of health care staff. The medication may not be the same as what you were taking when you arrived. Non-prescription, over-the-counter medications (for example, aspirin) are available for sale in the commissary. A limit will be placed on the number of such medications you can purchase. All over-the-counter medications will be available for purchase in single-dose packages only. At no time will one inmate be allowed to assist in the dispensing of any medications. Indigent inmates will be provided medications free of charge.

## PERSONAL PHYSICIANS

You can see your personal medical doctor and/or dentist but only if he/she agrees to see you, however they must come to this facility.

## OTHER MEDICAL SERVICES

If for any reason in-house health care professionals feel it necessary, you may be transported to outside health care facilities (for example, the hospital) for treatment. All decisions concerning treatment at an outside facility will be made by health care staff.

## LAW LIBRARY SERVICES

An in-house law library is available for your use from 9 a.m. to 4 p.m., Monday through Friday. You must sign up for the law library through the unit deputy. You are allowed one (1) hour per week to research your case. Under no circumstances will law books be allowed to be removed from the library. You may bring paper and pencils to the law library.

Disruptive behavior will result in loss of privileges to attend the law library for a 90-day period. If you are on disciplinary or Classification has placed you on the list for assaultive and/or threatening behavior or you become a danger to the order of the facility, your law library privileges to attend will be suspended until your classification level changes. Inmate Services will contact you on weekly basis in order to accommodate your law library request. (This does not mean that you do not have access). We will accommodate any reasonable request for information. You may contact your attorney for any additional information that we do not maintain in the law library. We will not research your case for you.

## COMMUNICATION WITH ATTORNEYS

Consistent with security, the rules governing telephone use, visiting privileges and mail, you have the right to call, receive visits or send and receive written correspondence to and from your attorney or

other legal representative. If you are level 4.2 due to disciplinary charges, you will only be allowed to use the phone to contact your attorney during your out-of-cell activity time or if special arrangements are made by your housing unit deputy. Inmates assigned to general population may use the phone during out-of-cell activity time or if special arrangements are made by your housing unit deputy.

## MONEY

You may not possess any money while confined to the facility. Possession of money is considered a contraband violation and you can be charged with a rules violation. A personal fund account will be set up for you at the time of your admission to the facility. Any money found on your person at this time will be recorded and deposited into your account. After your admission, any funds sent to you through the mail or left by visitors will be deposited into your account. The finance clerk will provide a receipt to you for the same. It is important that you tell your friends and family that only cashier's checks and money orders will be accepted. Any purchases you make while confined will be withdrawn from your account (i.e.: commissary, haircuts, photocopies, etc.). You may spend up to the current allotted amount on commissary each week from your account. Under special circumstances, other withdrawals may be authorized. Funds may be placed on your account only. If funds are placed on another inmate's account by you, both may be subject to disciplinary action.

## INDIGENT STATUS

**Indigent Status:** To be considered indigent, you must have less than 50 cents in your inmate account and a total of thirty (30) days incarcerated and sign up through the unit deputy.

**Maintaining Indigent Status:** You must continue to have less than 50 cents in your Inmate Funds Account. You will not be eligible for indigent hygiene until after 30-days from the last purchase of commissary.

**Indigent Hygiene:** Less than 50 cents in your inmate account and a total of seven (7) days incarcerated. As long as you are indigent, you will receive a hygiene kit every thirty (30) days that you request it. Hygiene kits include one comb, toothpaste, toothbrush, deodorant and razor.

Hygiene kits will be issued upon request for pen returnees without a seven (7) day waiting period.

**Indigent Legal Mail:** To receive legal materials (envelopes), you must sign up through the unit deputy. Inmate Services will verify your legal mail, allow you to address and mail your legal mail in the presence of the Inmate Services Clerk and or Inmate Service Deputy. Legal materials (envelopes) will be issued for legal correspondence only. You may be entitled to mail up to five (5) ounces of first class legal mail per week at county expense.

*Note: you will be provided legal mail only to communicate with your lawyer or a government agency concerning your legal affairs. Any abuse will result in disciplinary charges.*

**Indigent Legal Materials Requirements:** You must have been incarcerated for thirty (30) days or more and sign up through the unit deputy on a weekly basis while maintaining indigent status and you will receive these items every week as long as you request them and remain indigent.

**Writing Packet includes:** 1 pencil and five sheets of paper. Envelopes will be issued for legal correspondence weekly.

*At no time will you be allowed to trade or barter with these items. At no time while being indigent can you be in possession of any commissary items. If you are found to be in possession of commissary items, disciplinary charges will be filed and the commissary items confiscated and destroyed.*

**Indigent Hair Cuts:** Haircuts will only be provided for jury trials. In order to receive an indigent hair cut, you must provide a copy of a speed letter indicating a jury trial and request a hair cut through your unit deputy. Indigent hair cuts may also be given at the approval of the inmate service director for hygiene.

## SMOKING POLICY

Inmates will be allowed to smoke only in the open courtyards adjacent to the housing units. Smoking is illegal inside the facility. Smoking is not permitted under the building overhang in the outside activity area. Violation of the smoking policy will result in disciplinary action or prosecution according to county ordinance. It is the inmate's responsibility to dispose of all cigarette butts into the can provided in the outside activity courtyard. Failure to do so may result in loss of smoking privileges.

## INMATE SERVICES

**Education Programs:**

Education programs include instruction for grade levels K-6, 6-8, and GED preparation. If you want to be in an education program, you must be approved. Once entering GED, each student is given a placement test to determine their educational level.

**Classification Level 1 and 2:** will be allowed to attend GED program.

**Classification Level 3 (New Admissions) and 4.1:** will not be allowed to attend GED.

**Classification Level 4 (Medical):** each case must be evaluated for attending the GED program each Wednesday by the Classification Board, after conferring with medical personnel.

**Classification Level 4 (Disciplinary, and Administrative Segregation):** These inmates will not be allowed to attend GED classes. If you want to take the high school equivalency test, you must notify the Inmate Services director. You must take, and pass the GED practice text before being eligible to take the final GED test.

1.      GED Classes:

      a.      All students must have a valid social security number. The GED practice
testing days are Tuesday and Thursday afternoon. GED testing to receive a
high school equivalency diploma is all day Tuesday and Thursday. When the
Little Rock School District classes are closed, there will be no classes at the
Pulaski County Regional Detention Facility.

**Photocopying Services:**

A charge of 25 cents for each page (1 side) copied will be withdrawn from your personal
account. This service will also be offered for any inmate that meets the Indigent Status criteria.
The cost of photocopying will be charged against your inmate account.

-      Personal legal documentation will be copied.

-      No legal books will be copied.

**Notary Services:**

You must submit a request to Inmate Services through your unit deputy. Your legal document must
have the following affidavit at the end of your document before it will be notarized. A notary fee of
$2.50 will be deducted from your account. This service will also be offered for any inmate that meets
the Indigent Status criteria. The cost of the notary will be charged against your inmate account.

**STATE OF ARKANSAS**

**COUNTY OF PULASKI**

**Subscribed and sworn to before me, a notary public this_____ day of_____ 20 ___.**

**My commission expires:** _____
                                  **Notary Public**

**Haircuts:**

The Pulaski County Regional Detention Facility has a licensed barber who cuts hair on Mondays
from 9:00 a.m. to 4:00 p.m. You may sign-up for this service through the unit deputy prior to
Monday if you want to receive a hair cut on the following Monday. All services are non-refundable.
Only the facility barber will be allowed to perform haircuts.

Indigent hair cuts will only be provided for jury trials. In order to receive an indigent hair cut, you

must provide a copy of a speed letter indicating a jury trial and request a hair cut through your unit deputy. Indigent hair cuts may also be given at the approval of the inmate service director for hygiene.

## COMMISSARY

The commissary will be available to you to purchase snacks, hygiene items and basic over-the-counter medicines once a week. The amount you may purchase as of this date is $65.00, which is subject to change. Funds must be on your account at least 24 hours prior to making your order. All funds must be in form of cashier check or money order. **(No cash or personal checks will be accepted.)**

Commissary order forms will be provided in each housing unit. Order forms must be turned in to your housing unit deputy, with no exceptions.

## TELEPHONES

At the time of your arrival at the intake unit, you will have the opportunity to use the telephone to notify family and friends that you are in jail. You will have the opportunity to call your attorney or legal representative and a bondsman. Once you have been classified and moved out of new admission status, you may make telephone calls according to your assigned classification level, as follows:

Classification Levels 1, 2, 3, 4.0 and 4.1:

You may use the telephones located in your housing unit from 7:00 a.m. to 9:30 p.m., during your out-of-cell activity time. The only exception to this is during meal times and clean up. All calls will be collect only.

Classification Levels 4.2:

You may use the telephone located in your housing unit to call your legal representatives, clergy and bondsmen only.

If you are in Level 4.2 for disciplinary reasons, you may use the phone only for legal reasons, except when approved by the on-duty watch commander in extreme emergencies.

All calls will be **COLLECT** only. Your housing unit deputy may limit the number of your calls if other inmates need to use the phone.

**Phone Cards:**

You may purchase phone cards on a bi-weekly basis. There is not a limit on the number of cards you may purchase. You may purchase a card by signing up with the unit deputy. The cost of the phone card will be deducted from your inmate account. All orders are final. Pulaski County Detention Facility will not be responsible for lost or stolen cards or the unauthorized use of the card. We do not refund money on cards ordered, we will place your ordered card in your property if you sign up

and refuse it. You may not trade or barter for cards.

4.2 disciplinary inmates can't purchase phone cards.

## RECREATION

You will be allowed at least one hour of out-of-cell recreation daily. Your behavior will dictate the amount of time you receive.

## TELEVISION

Televisions are in each housing unit (except disciplinary unit) and are a privilege to use. Any disputes about television channel selection and/or volume will be resolved by your housing unit deputy, who has the authority to turn off the television at any time. Televisions will be turned off from 10:00 p.m. to 8:00 a.m. and during clean-up and meal times. Televisions are the property of the Pulaski County Regional Detention Facility. Any misuse, abuse, destruction or unauthorized alteration of this equipment is a violation of disciplinary guidelines and may be subject to criminal prosecution.

## RELIGIOUS SERVICES

You will be granted the opportunity to practice your religious beliefs provided they are recognized by the facility and do not jeopardize the security of the facility. If your religious beliefs are not recognized, you may make a written request to the Sheriff and/or Chief of Detention to address the situation. You will be provided the opportunity to participate in religious programs/counseling offered at the facility. You may receive religious literature through subscriptions or good will donations as long as they are in paperback form and have been approved by the Chief of Detention.

All religious activities will be held in the multi-purpose room and will be supervised by an authorized voluntary staff member.

## MAIL REGULATIONS

Pulaski County Regional Detention Facility officials acknowledge that inmate correspondence with family, friends, business associates, legal representatives, and others is not only important for maintaining order within the facility, but in some cases, is an established right.

**Privileged Mail:**

Any correspondence mailed to or from attorneys, court officials, other government officials and/or members of the news media. In order for mail to qualify as "privileged mail," the envelope must have some identifiable markings or title on it (e.g., Mr. John Doe, Attorney at Law; Judge Smith; Ms. Jane Doe, ABC News, etc.).

**General Mail:**

Any correspondence mailed to or from an inmates' friends, family, business associate, or any other individual not covered under the definition of "privileged mail." General mail may also include newspapers from their publisher. Hoarding of newspapers will not be allowed. Excessive paper is a fire hazard. No inmate will have in their possession more than two newspapers.

Mail delivery will occur every Monday through Friday. Mail received on Friday will be processed out and distributed to inmates on Monday (excluding holidays). Mail should not be held longer than twenty-four (24) hours (excluding weekends and holidays). Under no circumstances will mail identified as privileged mail be searched without being in the presence of the inmate to whom the mail is addressed. Inmates need to understand that all incoming mail is subject to examination for contraband. All money sent through the mail for inmate use must be in the form of either a cashier's check or money order.

Inmates will be instructed to seal all outgoing mail. An official mailbox will be located in each housing unit and inmates will be advised to deposit all outgoing mail in the unit mailbox. Inmates may purchase pre-stamped envelopes through the commissary. Inmates designated as indigent may be provided up to five (5) pre-stamped envelopes per week, for legal mail.

Requests for envelopes by indigent inmates must be made to Inmate Services. Inmates are allowed indigent mail for legal purposes only, which is verified by inmate services and initialed). All mail to and from high risk or security risk inmates will be inspected for contraband. Inmates are not permitted to send mail to and from inmates within the facility. Reading and censoring will be up to the discretion of the Chief of Detention. (Exceptions: mail to attorneys, courts and judges.)

Incoming general mail may be withheld if any part or all of it contains one or more of the following:

- Threats of physical harm against any person.
- Threats of blackmail or extortion.
- Contraband or plans to send contraband to the facility.
- Instructions for making weapons, drugs, or alcohol.
- Plans to violate any rules or regulations of the facility.
- Plans to escape or assist in an escape.
- Plans for the committing of a crime or evidence of a crime.
- References to sexual activity that actually threatens facility security.
- Any other material that actually may threaten the general order and security of the facility.
- Letters / envelopes containing postage stamps and/or envelopes.
- No pictures allowed.

*This page revised on April 22, 2010.*

## WORK ASSIGNMENTS

If you are sentenced you can be required to work. Pre-trial detainees may volunteer to work. Work applications for food services, maintenance, general housekeeping, etc., may be obtained from your housing unit deputy. All approved applications will be forwarded to the inmate work coordinator and requests will be considered as jobs become available. The decision to either approve or deny work applications will be provided to you in writing.

## BASIC INMATE RIGHTS

You are entitled to humane treatment and to protection from threats, intimidation and physical injury.

You are entitled to appropriate and necessary medical and dental care. You are to be provided with the items necessary to maintain personal hygiene, cleanliness and health, to include access to bathing facilities, personal care items, clean clothing, bedding and linens.

You are entitled to at least three (3) meals a day that provide adequate daily nutrition.

You have the right to participate in regular out-of-cell exercise, provided that it does not jeopardize the security and/or safety of the facility.

You have the right of access to the courts. This includes the right to reasonable access to attorneys, either by telephone or through visits and/or mail. We provide, as a privilege, access to the Law Library and to law library materials.

You have the right to practice your religious beliefs, so long as the practice of those beliefs does not affect the security and order of the facility. You also have the right to freedom of speech, provided that you do not exercise that right in a manner that jeopardizes the security and order of the facility.

You have the right to freedom of association and the right to privacy, subject to the maintenance of order and security of the facility.

## VISITATION

At your arrival time in the Intake unit, you may establish a list of (15) visitors' names, addresses and phone numbers. All inmates must wait a period of 72 hours before he or she can have social visits. All children fifteen (15) years of age must have a picture I.D. in order to visit with inmates in the facility. All children under the age of eighteen (18) years of age must be accompanied by an adult during visitation, no exceptions. Children under fifteen (15) years of age do not have to be on the inmate's initial visitation list. However, if an adult for visitation is accompanying children, the visitor scheduling the appointment must inform the clerk. All visits will be limited to 30 minutes and will be on a first-come, first served basis, and by appointment only. Visitors must check in 15 minutes prior to their scheduled appointment. **NO EXCEPTIONS - FAILURE TO REPORT IN AT THE APPROVED TIME WILL CANCEL THE VISIT. ALL APPOINTMENTS MUST BE MADE TWENTY-FOUR HOURS IN ADVANCE.** Only three (3) visitors may visit at one time. A visitor under the age of 18 is considered a visitor and must be included in the visitation

appointment list. An inmate is allowed only one (1) visit per day. All visits will be non-contact visits and will take place in the visiting area located in each housing unit. Upon written request an inmate may change or revise their visiting list, monthly. Once an inmate removes a name from his or her visitation list, that person may not be added back to the list for a period of thirty (30) days. Bondsman can visit at any time if needed, by checking in through visitation. While you are housed in an intake unit, you will have the opportunity to visit with your bondsman, as needed.

You may meet with your attorney during normal visitation hours. If you are housed in the intake unit for longer than 72 hours, you will be allowed general visitation privileges. Once you have been classified, your classification level will determine your general visiting privileges:

**Visitation Hours are from 9:00 a.m. to 7:00 p.m.**

All inmates are currently receiving one visitation per week with the exception of out-of-town visitations (traveling over 100 miles one-way). Out of town visitors are given one unscheduled visitation and after the first visitation they are informed of the rules of inmate's visitation. A sheet is provided to them with all of the updated information. After the first visit, all normal rules apply. Out of town visitors must provide a valid picture I.D. showing proof of residency.

Inmates with the last name beginning with A-M visitations are Saturday or Monday
Inmates with the last name beginning with N-Z visitations are Sunday or Tuesday.

Inmates may receive only two clergy visits per week. Approved clergy will be allowed to visit anytime during normal business hours in the visitation booth. Clergy must possess an I.D. card issued by the County Clerk's Office.

Trusty visits are scheduled by them and forwarded to Visitation on a list informing us of the visitation and time. The inmate's family must call to see if they are on the list for visitation. Trusty visitation rules apply as with the other inmates. Trusties are informed not to schedule visitations during their work hours; trusties will not be held in for social visits.

**\*\*\*\* Visitation schedules are subject to change at any time in order to meet facility security needs or manpower constraints. \*\*\*\***

## PERSONAL PROPERTY

Your personal property that you wear into the facility will be stored at the jail. Unless you are in disciplinary or administrative confinement, you may keep the following property with you in the unit:

| | |
|---|---|
| Legal documents or papers | Prescription glasses, |
| & magazines | Detention clothing and supplies. |
| Commissary items | |

Any items other than those listed above are considered contraband and are subject to confiscation

and disposal according to the rules of the facility. Inmates on disciplinary or administrative confinement may be restricted from keeping certain items, depending on the reason for the confinement (suicide risk, disciplinary, etc.).

If you want to release your valuable property to a family member or friend, you must complete a "Release of Property" form, and release **all** your valuable property. Partial property releases will not be done. Anyone claiming your property will be required to show proper identification and sign the release form. Property will be released seven (7) days a week, twenty-four (24) hours a day, excluding holidays.

Your clothing will be stored at the facility and returned to you at the time of your release or transfer to the Department of Corrections. If you feel any property stored at the facility during your confinement has been damaged or lost, immediately advise the property clerk. The clerk will notify the intake supervisor who will make an attempt to resolve your concerns. If you are not satisfied, you may submit a written complaint to the commander of Intake for resolution.

## LAUNDRY

Your clothing and linen will be picked up twice weekly for laundering. Laundry schedules will be posted in your housing units. You must turn in dirty items to be issued clean items. Your housing unit deputy can provide you with additional information and procedures.

## MEALS

You will be served three (3) meals daily per Arkansas Jail Standards. Approximate meal times are:

| | |
|---|---|
| Breakfast: | 7:00 a.m. |
| Lunch: | 11:30 a.m. |
| Supper: | 4:30 p.m. |

Special diets for medical reasons must be approved by the medical staff. Inmates committed to the facility will be charged a fee for each meal as authorized by law, which will be deducted from your account. The price for each meal will not exceed the current food contract cost. Lack of funds will not prevent you from receiving meals, however this amount will be carried as a negative balance on your account.

## DETENTION FACILITY PERSONNEL

There will be a sufficient number of supervisory and relief personnel provided. The Pulaski County Detention Facility will adhere to the Jail Standards handbook as to facility personnel available at all times. The specific number of personnel available will be one deputy to (80) inmates. Any number over 80 will have two (2) deputies.

Tear gas, mace, or pepper spray will only be used for the following:

1.   Enforce a lawful order given to an inmate
2.   Subdue an inmate who is violent.
3.   Maintain the security of the facility.

Tear gas, mace, or pepper spray will only be used by detention personnel who are trained in its use; it's affects to the body & first-aid treatment for reactions to them.

## PROCEDURES FOR INMATES
## DISCIPLINE / RULES AND REGULATIONS

A prisoner or inmate shall be subject to discipline only for those violations described in this handbook or those which have been or may be prescribed by state law. If the offense committed constitutes a crime, the Chief shall refer the case to the appropriate division for formal charges. Whether or not the offense constitutes a crime, the inmate shall be subject to disciplinary action.

**Rules and Regulations:**

1.   All inmates will comply with any and all directives given them by a staff member. Inmates will receive all instructions from the unit deputy. Inmates will not be allowed to approach anyone entering the unit, without first obtaining permission from the unit deputy.
2.   Inmates will not assault any person while in this facility.
3.   All inmates are required to keep their living area clean. Excessive paper, trash, uneaten food (except authorized unopened commissary items), will not be tolerated. All personal items must be stored in the action packer when not in use. All inmates except those that are medically excused, will assist in the clean up of all community areas at the direction of the unit deputy. This includes day rooms, activity areas, showers and outside recreation areas.
4.   Inmates are required to maintain personal hygiene while in this facility. Shower facilities are available and inmates are required to shower daily.
5.   At no time will an inmate enter another inmate's room unless directed to do so by a staff member.
6.   Inmates will not sit or lean on the upper level railing nor on, or under, the stairways in the housing unit.
7.   Inmates will not bring blankets, sheets or any other bedding from their rooms unless directed to do so by a staff member.
8.   Inmates will be required to keep their beds made any time they are not in bed. No item of clothing, towels or bedding will be hung on rails or doors of any inmate's room.
9.   Inmates will consume their meals in the activity areas unless directed otherwise by the housing unit deputy. This will not apply to lock-down units.
10.  All inmates will stand for head count when directed to do so by a deputy.
11.  All inmates will wear an identification badge. No services will be given an inmate who cannot be properly identified. It will be the inmates' responsibility to request a new ID badge should the old one need replacing. Obvious tampering with the ID badge will result

in disciplinary charges being filed. There will be a $5.00 charge for the replacement of any damaged ID Badge.

12. Inmates are not permitted to take personal items outside this facility except on final departure. This does not include legal documentation relating to their case, which will be allowed to be taken to court.

13. Inmates are strictly prohibited from possessing any item considered as contraband. Contraband is defined as any item not officially issued by the Pulaski County Regional Detention Facility, purchased from commissary, any item altered so as to perform a function other than that for which it was intended or excessive amounts of any authorized materials.

14. Inmate telephone calls are collect calls only. Calls are limited to fifteen minutes in length. There is no restriction on the number of attorney phone calls an inmate may make. Three-way calls are not allowed.

15. Inmates will be fully dressed any time it becomes necessary to be out of their assigned room. No hats or head covering will be allowed.

16. Inmates are required to immediately go to their rooms any time a disturbance occurs in the housing unit or when directed to do so by any staff member.

17. All inmates will ensure that the door of their room is securely closed at all times and will immediately report any malfunction to the unit deputy.

18. Inmates are not allowed near or behind the deputy's work station (including on the stairs). You will remain outside the red line from the workstation at all times unless directed differently by a staff member.

19. Inmates will not take chairs, food items, or beverages to the outside activity area or upstairs unless directed to do so by a staff member.

20. Inmates will not participate in any gambling activity.

21. Inmates are permitted to only have authorized underwear.

22. No jewelry will be worn by inmates in this facility. All jewelry will be kept in the facility property room. Only prescription glasses are authorized for wear in this facility. No handmade jewelry, handmade accessories, or cosmetics.

**NO INK PENS, COLORED PENCILS, CRAYONS, OR MAGIC MARKERS ARE ALLOWED.**

**INMATES ARE PROHIBITED FROM PARTICIPATING IN ANY GANG ACTIVITY.**

**INMATES MAY BE ORDERED TO PAY RESTITUTION BY THE DISCIPLINARY BOARD IF THEY DAMAGE OR DESTROY ANY COUNTY PROPERTY.**

## VIOLATIONS

The following infractions shall be considered **Minor Violations** of the Pulaski County Detention Facility:

**A. Class I Violations:**

1. Abuse of a privilege (telephone, mail, visitation, library, commissary, recreation, television, trusty status, education or therapy status).
2. Disrespectful language or conduct toward a staff member
3. Being out of assigned place or failure to stand for headcount.
4. Making unauthorized contact with staff members entering the unit.
5. Failure to maintain a clean and orderly living area.
6. Failure to disperse and go to room during a disturbance.
7. Failure to observe basic standards of personal hygiene in bathing and grooming.
8. Leaving room door open.
9. Failure to wear identification badge properly at all times.
10. Failure to be fully dressed when outside living area.

Any violation may result in disciplinary charges being filed. All violations will be documented by the housing unit deputy.

The penalties for the above violations may result in lock-down and loss of general privileges for **UP TO TEN (10) DAYS AND THE LOSS OF TEN DAYS OF MERITORIOUS GOODTIME (also see minor violations p. 20).**

The following infractions are considered **Major Violations** of the rules and regulations of the Pulaski County Detention Facility:

**B.   Class II Violations:**

1. Refusal to obey an order from a staff member in a timely manner.
2. Fighting.
3. Theft of property.
4. Possession of stolen property.
5. Tampering with or blocking any device or security equipment.
6. Possession of contraband. (See definition of contraband.)
7. Interference with a staff member performance of duties by verbal or physical intimidation.
8. Abuse of the Indigent Program.
   a. If you remain on indigent status but have money placed on another inmate's account (one who is not indigent), and have that inmate buy and pass commissary to you, you will be subject to disciplinary actions. Any inmate who orders commissary must maintain possession for his/her personal use.
   b. Trading indigent supplies to another inmate for anything.

9.   Abuse of the Grievance Procedure.
10.  Furnishing prohibited articles to another inmate.
11.  Indecent exposure.
12.  Disorderly conduct.
13.  Aiding or abetting in the commission of any rule violation.
14.  Deliberately flooding of a cell or shower.

The penalties for the above violations may result in lock-down and loss of general privileges for UP TO TWENTY (20) DAYS AND THE LOSS OF TWENTY (20) DAYS OF MERITORIOUS GOODTIME.

## C. Class III Violations:

1.   Causing bodily injury to another inmate
2.   Causing bodily injury to a staff member.
3.   Inciting a riot.
4.   Sexual activity by coercion or consent.
5.   Assault; any willful attempt or threat to inflict injury upon the person of another with or without a weapon.
6.   Making sexual threats or gestures towards a staff member.
7.   Participating in a riot.
8.   Extortion, gambling, blackmail, demanding or receiving anything of value for protection of any kind.
9.   Causing a fire or setting of any fire, through carelessness, neglect or deliberately.
10.  Escaping, conspiring or aiding an escape.  This includes second degree escape.
11.  Making, using, hoarding, possessing intoxicants or drugs or being under the influence of same.
12.  Participating in gang activity.
13.  Making false accusations against another inmate or Staff.
14.  Menacing with a weapon or what appears to be a weapon.
15.  Possession of a weapon
16.  Destruction or damaging of County property.
17.  Failure to take or pass a random drug test.

The penalties for the above violations may result in lock-down and loss of general privileges for UP TO THIRTY (30) DAYS AND THE LOSS OF THIRTY DAYS MERITORIOUS GOOD TIME.

Observation of Infraction:

When a staff member witnesses a violation of rules by inmates, he/she shall initiate procedures as follows:

- Violent Inmates - If the inmate is violent or there is immediate and reasonable cause to believe the inmate will inflict injury on another person, himself, or facility property, the inmate shall be promptly confined in a Behavior Management Unit.  This action must be

approved by the watch commander.

- **Minor Violations** - If the violation appears minor in nature, (see minor violations, p. 18), the unit deputy shall either:

    1. Verbally warn the inmate (s) that the behavior displayed is inappropriate, if the behavior occurs again, room confinement will be used as a corrective measure, or:
    2. Place the inmate on room confinement in accordance with the "Minor Violations" section of this handbook, p.18.
    3. Disciplinary charges may also be filed upon the deputy's discretion.

All incidents that involve room confinement will be documented in the unit log. The Shift Supervisor will be notified when an inmate is placed on room confinement. The Classification personnel will document the reason and the amount of time of the lock-down on the inmate's computer book-in narrative page.

- **Major Violations** - If the violation or infraction appears major in nature, the unit deputy shall promptly notify the watch commander and write an incident report.

- **Violation Review** - Upon the receipt of a written report of any violation, the shift supervisor shall review the facts and determine the appropriate action:

    1. File formal charges to the disciplinary board.
    2. File criminal charges.
    3. Refer to watch commander for further investigation.
    4. If harm to himself, another inmate, staff or facility property is imminent, confinement in the Administrative Segregation Unit.

Female and Juvenile inmates will be confined in a sub-day room of the respective housing unit.

**Informing the Inmates:**

The shift supervisor will inform the inmate of the action taken as soon as possible. If charges are filed to the disciplinary board or officer, a notice of charges (s) will be given to the inmate, along with a copy of the incident report at least 24 hours before the hearing.

**Charges:**

Alleged violations warranting discipline will be forwarded by the watch commander to the disciplinary board or officer. Charges must be in writing and also must specifically state or describe the alleged violation. The watch commander shall insure that the charge is sufficiently specific and that the specific section(s) of this code are placed on the charge and a copy will be given to the inmate. A hearing on the charge will be held within 72 hours (excluding weekends and holidays). Hearings will be held every Monday, Wednesday and Friday, or as needed.

**Hearings:**

All hearings will be conducted by the Disciplinary Board or Officer. The inmate charged will be present at the hearing except during the boards' deliberations unless he has specifically waived this right in writing or if the board chairman decides that the inmate's presence would jeopardize the secure and orderly operation of the facility. Any time that an accused inmate is excluded from the hearing, the reason must be documented in the record. The chairman will call those witnesses he considers reasonably available and necessary to address the charges. Incident reports and written witness statements will be considered by the board as evidence when a witness cannot attend.

All witnesses will be subject to cross-examination. However, an inmate cannot be compelled to be a witness against themselves. The formal rules of evidence shall not apply; however, all decisions of the board shall be based on substantial evidence. All decisions of the board shall be in writing, and the board will make finding as to disputed issues, set out its conclusions and, if appropriate, assess the discipline. All decisions will be rendered within 24 hours of the hearings (excluding weekends and holidays).

**Appeals:**

An inmate may appeal the decisions of the board to the Sheriff or designee. All appeals must be in writing. If an inmate cannot write, the Chief of Detention will appoint someone to assist the inmate. The appeal must be forwarded to the Sheriff or designee within **48 hours*** (excluding weekends and holidays). The Sheriff, or his designated representative, will affirm, reverse or modify the decision of the board within **72 hours*** (excluding weekends and holidays) of receipt of the appeal.

This decision will be final, will be in writing and will state why the decision is affirmed, reversed or modified. The discipline imposed by the board may not be imposed until the time for appeal has run, or if an appeal is filed, until the Sheriff has rendered his decision.

**Disciplinary Segregation:**

A. **Definition** - Disciplinary Segregation: "A transfer to more restrictive confinement than the general population, as sanction for violation of a rule or law". An inmate may be placed in disciplinary segregation only upon conviction by the disciplinary board after a fair and impartial hearing and exhaustion of his right to appeal.

B. **Location** - The Behavior Management Unit will be for male inmate serving disciplinary sentences. Additionally, the cells in the disciplinary units will not be used to house inmates on non-disciplinary status except in case of emergency. The Behavior Management Units will be furnished with proper heat, light, ventilation and sanitary facilities.

C. **Female Inmates** – Female inmates will normally serve out their disciplinary sentences in the lock-up rooms in the Women's Unit.

# ADMINISTRATIVE SEGREGATION

Administrative Segregation is a form of separation from the general population used when the continued presence of the inmate in the general population would pose a threat to life, self, property or to the secure and orderly operation of the facility.

**Reasons for Administrative Segregation:**

1. Medical observation (includes psychological)
2. Escape risk and persons who pose a risk to security and order.
3. Suicide risks.
4. Protective Custody - May be voluntary or involuntary.
5. Inmates who continue to participate in gang activity.
6. Inmates awaiting Disciplinary Board action who present a threat to good order and security. Inmates will not be removed from general population status for disciplinary reasons without justification spelled out in a Pre-hearing Detention Form. In cases when the on-duty watch commander feels that temporary confinement (a "cooling off" period) is needed, this is permissible with documentation; however, formal disciplinary charges must be filed by the end of the investigating watch commander's tour of duty or the inmate must be transferred back to the general population.

**Documentation:**

Written reports detailing the reasons for placing the inmates in Administrative Segregation shall be prepared and forwarded to the classification board and the Chief of Detention.

## CONDITIONS OF ADMINISTRATIVE SEGREGATION

Inmates on Administrative Segregation shall not be deprived of any rights guaranteed by laws or any privilege of the general population; as is consistent with existing conditions and/or the security needs of the facility. Inmates on Administrative Segregation shall be housed in the following area (s):

1. Female and juvenile inmates will be confined in a sub-day room of the respective housing unit.
2. Administrative Segregation Unit.

**Administrative Segregation Procedures**

**Protective Custody:**

   A. You can be placed in protective custody status in three (3) ways:

      1. You can request that you be placed in protective custody status; or,

    2.    A staff member can recommend you be placed in protective custody. You may be placed on protective custody if you provide substantial reasons to suggest that your life or the lives of others are jeopardized as a result of your continued housing in a particular housing unit.

    3.    A judge or prosecutor can recommend that an inmate be placed in protective custody status.

B.    All requests for protective custody, either by you or by the staff, will be granted by the watch commander.

C.    All requests for protective custody, either by you or by the staff will be forwarded to the classification board for consideration.

D.    The classification board will review at its next meeting such requests. The classification board will respond to your request immediately after the classification board meeting.

E.    You have the right to appeal to the Chief of Detention or his designee on any ruling that you are not satisfied with.

F.    The Classification Board shall review the status of all inmates in Administrative Segregation at least once a week. The inmate will have the opportunity to appear in person to present his/her case to the board every thirty (30) days.

**Release from Administrative Segregation:**

Release from Administrative Segregation may be authorized by the following:

    1.    The Classification Board.
    2.    The Medical Authority.
    3.    The Chief of Detention or designee.

In all cases, release may be authorized only when the condition which required administrative segregation no longer exists.

## GRIEVANCE PROCEDURE

A grievance is an allegation or accusation suggesting you have been mistreated, neglected, abused or deprived of something unlawfully; or that a staff member has committed an action which is in violation of department rules and regulations.

**Steps of the Grievance Procedure:**

1.    Inmate must first attempt to verbally resolve the grievance, incident, problem or complaint through the unit deputy.

2.    If the problem can not be resolved, the inmate may file a written grievance within fifteen (15) days of the incident or occurrence. **Note: The grievance may only address one (1) issue or problem and should also state what corrective action you seek. The grievance may only address issues directly relating to an incident or event involving the griever. You**

cannot file a grievance on behalf of someone else.

3. Initial processing - completed forms will be placed in the locked grievance box provided in every unit. The grievances will be collected every day, excluding weekends and holidays, and delivered to the Grievance Office.

**Time Frame of Grievance Procedure:**

The grievance will be answered within ten (10) working days of the Grievance Officer receiving your grievance. An extension may be filed in order to give the Grievance Officer more time to complete the investigation. A written explanation will be submitted to the inmate explaining the delay in processing.

**Emergency Grievances:**

Griever may declare an emergency situation only if they believe that by observing the regular time limits for disposition, they may be subject to risk of personal injury or other serious and irreparable harm. Emergency grievances may be filed as follows:

- The griever will mark the appropriate box on the grievance form indicating an emergency situation.

- The housing unit deputy will notify his/her watch commander or designee of an emergency grievance.

**Note: Disciplinary action will be taken against any inmate filing a false emergency grievance. Appeal Process:**

1. The griever may appeal the answer received from the Grievance Officer or designee within ten (10) working days of receiving an answer to their grievance.

2. The Chief of Detention will attempt to resolve the matter or uphold the decision of the Grievance Officer.

3. The Chief of Detention has five (5) working days to respond.

**Note:** Release of the inmate from custody will normally terminate his/her grievance, unless the parties are under court order to exhaust remedies or the grievance highlights a problem with overall facility operations.

**Matters Which Cannot Be Grieved:**

1. Trusty job assignments
2. Release matters
3. Housing unit assignments

4.    Disciplinary matters
5.    State and Federal case laws and laws or regulations
6.    Anticipated events
7.    Requests for disciplinary actions against an employee
8.    Claims for monetary damages
9.    Administrative directives
10.   Group petitions
11.   Any matter beyond the control of the Pulaski County Detention Facility

**Abuse of the Grievance Procedure:**

1.    Excessive use of the procedure. Excessive is defined as the submission of numerous or redundant grievances beyond that which is considered reasonable.
2.    Declaration of an emergency grievance when it is determined that no emergency existed.
3.    Use of indecent or vulgar language.
4.    Malicious use of the procedure by any inmate who knowingly makes false statements about staff.
5.    Frivolous grievances which are clearly insufficient and readily recognizable as devoid of merit or do not provide a sufficient basis for appeal may be returned to the inmate without being processed.

Grievance Request Forms can be obtained from the deputy in each housing unit.

You will be provided a copy of your grievance form when the response is returned. In all cases you will be required to sign the bottom of the original form (signifying you have been provided a response).

The original grievance form and the response must be returned to the Grievance Officer within three (3) days of completion. In the event you are not satisfied with the initial answer, you can file an appeal to the response.

Appeals must be filed on the grievance appeal form within 24 hours following receipt of the initial request/complaint/grievance response. Appeals should also be placed in the special mailboxes and will be controlled by the Grievance Officer in the same manner as the initial request/complaint/grievance.

**In The United States District Court For The Eastern District of Arkansas**
**Western Division**

BILLY HILL, et al., ........................................................................................................Plaintiffs
V.              NO.LR-C79-465
PULASKI COUNTY, ARKANSAS, et al., ...............................................................Defendants
RONNIE TOWNSEND ...........................................................................................Intervener

**ORDER**

This order is centered upon the application of plaintiffs, for a preliminary injunction. A hearing on the matter was held December 17, 18 and 19, 1979.

The court makes the following findings of fact and conclusions of law:

The court has jurisdiction of this matter, which was brought pursuant 42 U.S.C. 1983, under the provisions of 28 U.S.C. 1343.

Four factors must be considered in deciding whether a preliminary injunction should issue: plaintiff's likelihood of success on the merits, the injury to plaintiffs if the injunction does not issue, the injury to defendants if the injunction does issue, and the public interest in whether the injunction is granted or denied.

3.      The court finds that there is a substantial likelihood that the plaintiffs will prevail at trial. The court reaches this conclusion based on several factors:

    a)      First, the court finds that there was substantial credible, live evidence that excessive force has been employed on occasion in the Pulaski County Jail. In this regard, the court credits the testimony of Sam Moore, Vincent Sims, Diane Taylor, and Melvin Melton.

    b)      The court is also impressed by the fact that officers involved in the incident with Billy Hill and Antonio Harriott made conflicting reports concerning the matter.

    c)      The court also gives weight to the fact that Billy Hill was taken from the juvenile pod to be questioned while he was still naked. This was inherently humiliating, and no excuse for this conduct was given.

    d)      Finally, there is the fact that the county filed a stipulation with this court three years ago, *Dickinson v. Davis*, LR-C74-25, and has not completely complied with the terms of the stipulation.

    e)      If the injunction does not issue, the plaintiffs will continue to be exposed to incidents of excessive force. Thus, the injury to them is comparatively great, while the injury to the county, if the injunction does not issue, will be slight, if there is any injury at all.

5.      Lastly, there is the question of the public interest. While the court recognizes that the public has an interest in having penal institutions for the incarceration of those charged with or convicted of violations of the law, the public also has an interest in humane treatment of persons so incarcerated.

6.      For all of the reasons set out, the court concludes that the injunction should issue.

7.      The defendants are hereby enjoined from the use of force or violence against inmates except when it is reasonably necessary, as perceived by the officer at the time, either (1) to enforce a lawful order against an inmate, or (2) to subdue an inmate who is offering violence against an officer or another prisoner. Sexual advances that are not consented to are also specifically prohibited.

8.      The defendants are ordered to post copies of the stipulation in *Dickson* and of this Order in each pod in a permanent fashion and to give a copy to inmates as they enter the facility. Further, the last sentence contained in the rules of *Dickson*, as compiled by the defendants, which was not contained in the original and speaks of modification or suspension of the rules, shall be deleted from those copies posted or passed out.

**In The United States District Court Eastern District of Arkansas**
**Western Division**

VEDELL DICKSON, ET AL. .............................................................................PLAINTIFFS
VS.              NO.LR-74C-25
LYNN DAVIS, ET AL. ....................................................................................DEFENDANTS

**DECREE**

From the pleadings, evidence and stipulations submitted, and statements of counsel, the Court finds and orders as follows:

1.      The Amended Stipulation of parties, filed of record on December 15, 1976, is hereby approved; and the defendants are directed to be in full compliance with the rules and regulations set forth in the Amended Stipulation no later than January 1, 1977.

2.      Plaintiffs' request that this cause be designated a class action is denied with prejudice.

3.      Plaintiffs' request that this Court promulgate a rule pertaining to the training of correction facility personnel is temporarily denied; but leave is granted for plaintiffs to reapply for such relief six months after the date of this Decree. Since state and county authorities are engaged in a project which envisions an adequate training program, the Court finds that

action should be deferred on this issue even if the Court has jurisdiction to promulgate such an order. The question of jurisdiction on this point is also left open. A renewed request for this relief must be made within three months after the expiration of six months from the date of this Decree.

4.   The request of plaintiffs' counsel that a reasonable attorney's fee be taxed as costs against the defendants and Pulaski County is left open pending submission of briefs by counsel, and pending a possible hearing if the Court determines that such relief is legally permissible.

## AMENDED STIPULATION

The plaintiffs (except Jack Rheuark who is proceeding *pro se*), by William R. Wilson, Jr., their attorney, and the county defendants, Judge B. Frank Mackey, Sheriff Monroe Love, Captain O. A. Allen, and Deputies Adrian West, Charles Clark, Larry Newkirk, Jim Glassburn, Paul Spradling and Joe Johnson, and their successors, by John Wesley Hall, Jr., Deputy Prosecuting Attorney, their attorney, hereby stipulate to rules of the maintenance of, and the manner of incarceration of detainees in the Pulaski County Community Correctional Facility (the correctional facility) and agree that they may be incorporated into a consent judgement.

A part of this action was originally brought over conditions of federal detention of the old Pulaski County Jail. Since the action was filed, the new correctional facility was opened, and the old Pulaski County Jail was closed to incarceration of prisoners. Plaintiffs filed a motion to establish rules which pertained to the facilities of the old jail. While the old jail is closed, this stipulation is in response to that motion. It is stipulated that, while rules on conditions of the facility are established herein; the parties stipulate the correctional facility is not presently in such condition. It is further stipulated that by agreeing to this stipulation, these defendants do not admit that these rules correct any specific wrongs on their part at the correctional facility.

The parties are stipulating to recognized constitutional rights and standards for jails and prisoner's life. For the purposes of seeking attorney's fees, plaintiffs specifically reserve the right to contend unconstitutional conditions previously existed. Federal detainees are referred to herein as "detainees."

## RULES OF PULASKI COUNTY COMMUNITY CORRECTIONAL FACILITY

1. OUTGOING MAIL

    1.1   Mail to attorneys shall not be read.

    1.2   Mail to judges, courts or elected public officials shall not be censored.

    1.3   There shall be no censorship of other outgoing mail except as is reasonably necessary to jail security. Other outgoing mail may be read in the jailer's discretion.

    1.4   There shall be no limitation on the persons to whom outgoing mail be directed.

    1.5   Outgoing mail shall be delivered to a mailbox or a mailman at least once every working day.

    1.6   Prisoners may freely obtain writing material and postage at their own expense either

from the correctional facility or other sources.

1.7    Indigent inmates may be entitled to mail up to five ounces of first class legal mail per week at county expense if they sign an affidavit of indigency for postage and writing material.

## 2. INCOMING MAIL

2.1    Mail from attorneys, judges, courts or elected public officials shall not be censored but they may be inspected for contraband. Mail from attorneys shall be opened only in the physical presence of the prisoner addressee and shall not be read.

2.2    Other incoming letters may be inspected for contraband, read and censored in whole or in part when reasonably necessary to jail security.

2.3    Incoming parcels may inspected for contraband.

2.4    Incoming parcels and mail shall be delivered within six hours of receipt by the correctional facility absent unusual circumstances.

## 3. TELEPHONES

3.1    Pretrial detainees shall be entitled to as many telephone calls as are reasonably necessary to obtain counsel if they are without counsel.

3.2    A reasonable number of other phone calls will be permitted if circumstances arise necessitating additional calls; e.g. changes in status of case, conducting necessary personal business.

## 4. VISITATION

4.1    A pretrial detainee shall be allowed to consult with his attorney or potential attorney at any.

4.2    Prisoners shall be allowed daily visitation by appointment only during regularly scheduled visiting hours. Accommodations shall be made for special circumstances.

4.3    Pretrial detainees and prisoners under sentence may have visitation privileges abridged or denied for a reasonable period if they are bona fide security risks, abuse visitation privileges, or have committed acts requiring discipline.

## 5. DIET

5.1    Minimum nutritional standards shall be maintained per the recommendations of a health official.

5.2    Foods shall be served at the proper temperature, fresh and in reasonable variety.

5.3    Serving methods shall meet minimum health standards.

5.4    Kitchen, kitchen equipment, food storage, and sanitation shall meet minimum health standards.

5.5    All persons, whether prisoners or employees, working in and around the kitchen and the handling and serving of food in the correctional facility shall meet minimum health requirements.

5.6     The correctional facility kitchen (or other kitchen from which food may come) and food service shall regularly be inspected by the public health authorities on the same basis as public institutions, and the recommendations or requirements made by the public health authorities as a result of such inspection shall be implemented by the correctional facility officials within the time allowed therefore by said public health authorities.

5.7     Special diets may be required for prisoners with specific health problems if ordered by a doctor.

## 6. MEDICAL

6.1     A physician must be available on call at all times.

6.2     Every entering prisoner must receive a medical examination within twenty-four hours of entrance by a licensed nurse or physician.

6.3     There must be a Daily sick call attended by a licensed physician or nurse; and a physician must appear for sick call at least once a week.

6.4     Arrangements must be made to meet the needs of prisoners with special medical problems.

6.5     The correctional facility nurse or paramedical assistants shall not prescribe prescription medication of any kind.

6.6     The services of a dentist will be available on call.

6.7     Adequate facilities for dental examinations and treatment, both curative and preventive, shall be available either at the correctional facility or a dental office.

6.8     Ample and adequate rooms and equipment for conductible physical examinations of inmates and entering prisoners shall be available at the correctional facility.

6.9     Quarters for inmates who are too ill to remain safe as part of the general population of the correctional facility, but not sufficiently ill to require hospitalization, shall be available at the correctional facility.

## 7. ACCESS TO THE COURTS

7.1     There shall be no confiscation or delay of legal reading of correspondence between courts and prisoners. Correctional facility officials, or anyone acting on their behalf shall not discourage the filing of habeas corpus petitions by prisoners.

7.2     Habeas corpus petitions may be mailed directly to the Court, and need not be presented to correctional facility officials for screening.

## 8. CELL CONDITIONS

8.1     There shall be proper illumination of each cell and other areas where prisoners may be held.

8.2     There shall be adequate heating in and cold seasons and there shall be adequate ventilation at all times.

8.3    There must be hot and cold water for bathing, in accordance with the standards for public institutions.

8.4    There must, at all times, be adequate working toilets.

8.5    All leaks in plumbing must be repaired immediately.

8.6    There must be an adequate and sanitary supply of drinking water.

8.7    The interior of the cells should be kept painted with a light colored, washable material.

## 9. CORRECTIONAL FACILITY PERSONNEL

9.1    There will be at all times not less than two guards on duty at the correctional facility for each pod or cell area inhabited at more than half capacity. At least one guard shall be stationed in the pod or cell area at all times.

9.2    There shall be a sufficient number of supervisory and relief personnel provided to insure that the required number of guards are on duty and patrolling activities are carried out.

9.3    Tear gas or mace shall only be used in emergencies by correctional facility personnel trained in its use, its effects on the body, and first aid for treatment for reactions to it.

## 10. DISCIPLINE

10.1    Solitary confinement is prohibited. Maximum security or isolation may be used under extreme circumstances, as a disciplinary measure, but only for physically violent prisoners whose behavior jeopardizes the health and safety of other personnel in and around the correction facility area.

10.2    Any maximum security or isolation facilities must be furnished with proper heat, light, ventilation and sanitary facilities, and must not be used for extended periods of time, and prisoners placed in isolation must not be deprive of clothing.

10.3    Maximum security isolation shall differ from normal confinement only in the loss of freedom and privileges permitted to other prisoners.

10.4    Prisoners who appear to be dangerously violent or suicidal must be examined immediately by a physician, and if he deems it advisable, removed to a mental hospital.

10.5    No pretrial detainee or prisoner shall be held in isolation more than thirty days. A review of the detainee's or prisoner's attitude shall be made at or near the end of any isolation term to determine whether an additional term of isolation is required.

10.6    Any prisoner aggrieved by a particular imposition of discipline has the right to ask that it be reviewed at a higher level of authority in the correctional facility administration than that of the authority who imposed it; and such reviews shall not be arbitrarily denied.

10.7    A prisoner subject to disciplinary action shall be furnished with an advance written copy of the charge against him, the right to call, confront and cross-examine witnesses, and written notice of decisions.

10.8    An inmate questioned by correctional facility officials regarding the commission of any offense subject to disciplinary action which is also punishable by the criminal law

shall first be informed that he has the right to remain silent, that anything he says may be used against him in a criminal proceeding, and he may have assistance in the preparation of his defense to the disciplinary action.

10.9   Inmates placed insulation or maximum security shall have the right to consult with counsel to the same extent as members of the general correctional facility population.

## 11.  HAIR

11.1   Detainees or prisoners shall not be required to get a haircut or shave unless reasonable necessary for health or security.

## 12.  READING MATERIAL

12.1   A library service shall be provided for prisoners.

12.2   There shall be no censorship of books, periodicals, etc., purchased or given to prisoners, except the jail official may, in their reasonable discretion, forbid the introduction into the correctional facility of books and periodicals which would come within the legal definition of obscenity.

12.3   The prisoner's possession of reading materials may be preceded by careful examination to detect contraband; and consideration of space, sanitation and orderliness may require certain limitations which would otherwise be constitutionally offensive if any ordinary citizen were involved.

12.4   Censorship or exclusion of certain reading materials would be justified upon a finding of a clear and present danger to prison morale, morality, discipline or security. Daily newspapers shall not be denied to prisoners, absent a clear and definite showing of a security danger by correctional facility officials.

## 13.  METHADON AND OTHER DRUG TREATMENT

13.1   Correctional facility officials shall not prevent pre-trial detainees, who immediately prior to their detention were participating in an approved methadone treatment program, from receiving methadone as prescribed by a medical doctor.

13.2   Pre-trial detainees shall be allowed to continue other necessary drug treatment programs in accordance with the next or preceding paragraph

13.3   The county shall not have to bear the cost of any such treatment.

## 14.  DISTRIBUTION OF RULES

14.1   A copy of these and other correctional facility rules shall be posted in prominent places in the correctional facility or furnished to all prisoners or detainees on admission to the correctional facility.

## 15. EFFECTIVE DATE

15.1    These rules shall be completely phased in by January 1, 1977.

IT IS SO STIPULATED.
DATED this 15th day of December, 1976.

JOHN W. HALL, JR.                    WILLIAM R. WILSON, JR.
Deputy Prosecuting Attorney              Attorney for Plaintiffs
Attorney for County Defendants


### In The United States District Court Eastern District of Arkansas, Western Division

BILLY HILL, ET AL. .............................................................................................PLAINTIFFS
          VS.                    NO. LR-C-79-465
PULASKI COUNTY, ARKANSAS,
ET AL. ........................................................................................................ DEFENDANTS
RONNIE TOWNSEND ................................................................................INTERVENER
DONNIE RAY COLEMAN, ET AL. PLAINTIFF-INTERVENER
WILLIAM E. BEAUMONT, ET AL. RULE 19 DEFENDANTS
CITY OF LITTLE ROCK, AND W. E. "SONNY"
SIMPSON, CHIEF OF POLICE, In His Individual
and Official Capacities.......................................... THIRD PARTY DEFENDANTS

### CONSENT DECREE

This decree is entered at the request and by the stipulation of the parties, and brings to an end this protracted and convoluted litigation.

This action was filed pursuant to 42 U.S.C. 1983 on October 23, 1979, on behalf of an alleged class of persons incarcerated and to be incarcerated in the Pulaski County Jail. The alleged class sought monetary and injunctive relief for denial of rights secured by the Eighth and Fourteenth Amendments to the United State Constitution. The defendants were Pulaski County, Arkansas, the Sheriff of Pulaski County, and several deputy sheriffs.

An order was entered January 10, 1980 (nunc pro tunc to December 1, 1979) which imposed a preliminary injunction against the defendants to prohibit the use of force or violence against inmates except under narrow, enumerated circumstances; to prohibit non-consensual sexual advances, and to abide by and publish a decree approved in previous jail litigation on December 15, 1976, viz., *Dickson, et al v. Davis, et al*, LR-C-74-25.

On August 5, 1981, this Court entered an order which certified the class in the case to be: "...a class composed of all persons now detained and those detained from time to time in the future in the Pulaski County Jail."

The Court further found the jail to be out of compliance with Constitutional requirements and previous Court Orders, found the Sheriff to be in contempt of Court for such shortcomings, and set a population ceiling of two hundred (200) prisoners for the Pulaski County Jail.

On October 23, 1981, the Court joined the Pulaski County Judge and the Pulaski County Quorum Court as parties defendant. Several plaintiffs who were class members had also intervened.

On December 4, 1981, pursuant to a Stipulation for Order filed December 1, 1981, the Court appointed a Special Master for ninety days to oversee and insure continued Constitutional operation of the Pulaski County Jail. The jail had become and remains in operation as a Constitutional facility.

On February 25, 1982, the Court extended the appointment of the Special Master to April 30, 1982.

On April 29, 1982, the Court entered an order approving a sliding scale of inmate-correctional officer ratios utilized at the Pulaski County Jail which would maintain constitutionality, approved a disciplinary code and grievance procedure and allowed the Special Master's appointment to expire.

From the time of the Court's order of April 29, 1982, to the present, the Court has had to intercede in the jail affairs twice; to-wit: the first at the plaintiff's request relative to two inmates (Chatley and Jones) whose application for relief was denied in part and granted in part by order of May 17, 1982, and ultimately deemed moot by order of July 19, 1983; the second (disposed of by the Court's order of April 11, 1984) to protect the jail's constitutional sovereignty from state compulsion of the Sheriff and other county law enforcement officials to accept prisoners in such quantity as to force the jail out of compliance.

Counsel for plaintiffs and counsel for the Sheriff have since May of 1982, by agreement, received a weekly review of inmates in disciplinary confinement and monitored same.

The Pulaski County Jail is attempting to function in a constitutional fashion and the remaining parties believe it can do so, provided the remedial portions of this decree are ordered and implemented.

The parties propose to finally dispose of this matter in a fair, reasonable and adequate manner to insure the continued Constitutional operation of the Pulaski County Jail, and have notified the class represented by the plaintiff of the intended closure of this case. The Court finds that the notice proposed herein has occurred and that the best interests of the class are protected by this settlement.

First, the parties agree that a permanent injunction in this matter should be entered. The terms of this injunction are:

The defendants are hereby enjoined from the use of force or violence against inmates except when it is reasonably necessary, as perceived by the officer at the time, either (1) to enforce a lawful order against an inmate, or (2) to subdue an inmate who is offering violence against an officer or another prisoner. Sexual advances that are not consented to are also specifically prohibited. Additionally, the defendants will be prohibited from allowing or permitting any prisoner physical access to another, when they know or should know that one prisoner intends physical violence to another.

The defendants are also ordered to follow all of the provisions of their stipulation in *Dickson*

*v. Davis,* supra.

All other prior orders of the Court concerning the terms and conditions of confinement, including but not limited to those pertaining to the adequacy of the diet, exercise, recreation, visitation, mail, telephone and all other communication privileges (visits with counsel, clergy and class counsel), medical care, overcrowding, and the previously ordered disciplinary and grievance code, shall remain in full force and effect. All orders entered in this litigation remain in effect.

Further, the jail personnel shall be prohibited from allowing one prisoner to play any part in the dispensing of medicines to any other prisoner.

All informal grievances may be presented to the pod guard for possible resolution. All formal grievances must be written and must be placed in the mail box which is made available to all inmates daily. A grievance officer will be appointed, and this person alone will remove the grievances, log them in and distribute them to the appropriate official for resolution as provided by the existing grievance procedure approved by the Court.

Also, in order to assure that no female is deprived of sanitary items, all such items will be logged by jail personnel as dispensed. The jail administrator shall issue an order directing all officers to honor all reasonable requests for additional toothpaste, soap, towels, or change of clothing. All inmates will be provided adequate toilet paper at all times.

The damage claims of the various name plaintiffs have been dismissed by prior order of this Court, pursuant to a settlement between the parties.

The defendants agree to make the following physical modifications to the jail in order that certain systemic problems will be cured: (1) maximum security will be remodeled so that it becomes in fact the maximum secure area of the institution, so that prisoners who present various escape or other security risks may be housed there rather than in the Observation Unit; and (2) the juvenile pod will be remodeled so that the instances of property destruction by juveniles can be adequately monitored and those actually committing such offenses can be determined, resulting in no general loss of privileges to the juveniles as a group.

The parties agree that counsel for plaintiffs have prevailed in this matter, and are entitled to reasonable fees and costs for all services rendered to date. (If the parties cannot agree on the amount of fees and costs rendered to date, plaintiffs may submit to the Court their itemized statements, along with any other submissions they care to make, in order that the Court may determine the reasonableness of their fees and costs.)

IT IS HEREBY ORDERED that the Sheriff of Pulaski County and his authorized representatives and employees shall continue to abide by the inmate population limits established in the stipulation of December 1, 1981, (except that C Pod may be used for up to twenty additional felons because of modifications and security measures that have been undertaken there). Further, the Sheriff and his designated representatives and employees shall refuse to accept custody of prisoners from any and all sources if the reception of such prisoner or prisoners will cause the population of the Pulaski County Correctional Facility to exceed the limits set

forth in the Stipulation of December 1, 1981. The Sheriff shall notify the Court of any material steps taken by any person or persons which attempt to contravene or impede the Sheriff's fulfillment of his obligations under this decree.

The City of Little Rock is hereby dismissed from this action, as is Chief Simpson.

George Howard, Jr.
U. S. District Judge

APPROVED AND STIPULATED:                    Date:  April 8, 1985

**John Forster**
**Attorney for Defendant**
**Pulaski County Sheriff**

**Richard Quiggle**
**Attorney for Plaintiffs and the Class**

**Stephen Curry**
**Attorney for Defendant,**
**Pulaski County**

Ex. - 2                                  1/1

| Office of the Pulaski County Sheriff | **Official Memorandum** **Pulaski County Detention Facility** |

**To:**       Inmate Polk, Allen#1902-11

**From:**   Chief R. Morgan

**Re:**       Response to Letter

**Date:**    February 22, 2011

You were arrested by NLRPD on February 4, 2011, and you remained in their custody during their paperwork processing and identification efforts. On February 5, 2011 at 1:37 p.m., you entered the custody of the Sheriff of Pulaski County under my supervision. On February 8, 2011 at 6:54 a.m., you were taken to NLRDC Video Arraignment by my designee Sgt. M. Briggs well before your 72-hour time allotment expired. Furthermore, Sgt. Briggs has informed me that you were removed from the court room at the order of Judge Hamilton for disrupting his proceedings. Judge Hamilton advised you that he found probable cause for your arrest, and that he was holding you without bond. You then attempted unsuccessfully to argue the constitutionality of your arrest, at which point you were returned to your cell.

You have also filed grievances with my grievance office. I will take this time to inform you that Judicial Orders, Laws, Policies, and Procedures are all non-grievable issues. Should you have any further questions regarding what you can and cannot do inside of the facility, I refer you to the inmate handbook that I have provided for you inside of the unit you are housed in.

NOTE: Additionally, the Inmate Handbook (Ex. - B) states at pages 25-26 that the following issues are "NON-GRIEVABLE":
#5.) State & Fed. Case Law, Laws, & Regulations,
#7.) Requests for disc. action against an employee, and
#8.) Claims for monetary damages.

In any event, there were no grievance forms available at the Northside Bmfein Facility and one could not have been written while cuffed & shackled on the floor in an extremely painful way.

A grievance filed at the main jail reporting the incident and requesting names of the Northside staff was not returned until 6/20/11. Neither P.C.D.F. nor N.L.R.P.D. claim Northside.

*ISSUE ; NORTH SIDE*

# GRIEVANCE FORM

## ONLY ONE (1) GRIEVANCE PER SHEET

For Office Use Only:
#: _____
Date Received:
06-06-11



**Inmate's Name:** *Allen Polk*    **Intake #:** *1902-11*

**Unit:** *T-424*    **Job Assignment:** *N/A*

**Have you discussed this problem with your Unit Deputy?** Yes ✓ No _____

**Provide a description, or explain the nature of your problem:**

When I was processed into the P.C.D.F. at the Northside bookin location in North Little Rock on Feb. 4, 2011, I was not allowed to take a shower to remove a chemical agent that was used on me during arrest; I was housed in a cell without drinking water on top for an excessive period of time, and when I complained about it, I was cuffed and shackled in a cruel and unusual manner which was excruciatingly painful for an extended period of time; the staff then ignored me when I was screaming for

**What do you want to happen to solve your problem?** them to take the cuffs off. I want an Internal Affairs investigation and I want the names of all staff present while I was held there.

**Inmate's Signature:** *Allen Polk*    **Date:** *June 4, 2011*

**Is this an emergency situation?** Yes _____ No ✓ If so, explain why.

Not on it ain't.

(An emergency situation is one which you may be subject to a substantial risk of bodily harm. It should not be declared for ordinary problems that are not of a serious nature. If you marked yes, you may give this completed form to any deputy department employee who will sign the attached emergency receipt, give you the receipt and deliver the remaining for, without undue delay, to the Watch Commander or designee. **Reprisals:** If you are harmed or threatened because of your use of the grievance ever, report it immediately to the Watch Commander. **Abuse of this program will result in disciplinary action.**

*THIS IS A GRIEVABLE ISSUE*
*PLEASE RESUBMIT YOUR*
*INMATE GRIEVANCE*

-------------------------------Tear Here-------------------------------

To be completed by the receiving member,

## Receipt for Emergency Situations

**Received from which inmate?** _____ **Intake #:** _____

**Date:** _____ **Time:** _____

_____ _____ _____
Printed Name of receiving member    D.S.N    Signature of receiving member

*Ex.-D*     *1 of 4*

Inmate's Name: _Folk, A_____   Intake #:_____   Grievance#: _____

## Grievance Officer's Decision

You were arrested and in the custody of the North Little Rock
Police Department on 02.04.11. We did not take custody of you
until 02.05.11. You will need to address this issue with North
Little Rock Police Department.
The grievance procedure addresses matters pertaining to this
facility.

_____     _____
Signature of Grievance Officer or Designee        Title        D.S.N.      Date

_____     _____
Signature of inmate receiving response                          Date

## Inmate's Appeal

If you are not satisfied with this response you may appeal this decision within ten (10) days by completing the information below.
**Remember, you are appealing the decision concerning the original complaint.**

**Do not list any additional issues which are not part of your original complaint.**

## Why do you not agree with this response?

_____     _____
Inmate's Signature                     Intake Number                Date

## Appeal Response

_____

_____

_____

_____     _____
Signature of Chief or Designee         Title        D.S.N.      Date

_____     _____
Inmate's Signature                     Intake Number                Date

If you leave the PCRDF prior to receiving an answer to your grievance, you may write us for the official
response. You must include a self addressed stamped envelope to the attention of the grievance
officer at 3201 W. Roosevelt Rd., Little Rock, AR 72204.

### Do Not Write in this Space

Ex.-D                    2 of 4              i_g_f    Page 2 revised-9/17/98

*Support Services*





**DANNY E. BRADLEY**
CHIEF

200 WEST PERSHING BLVD.
NORTH LITTLE ROCK, ARKANSAS 72114-2294

PHONE: (501) 758-1234
FAX NUMBER: (501) 771-7157 (SERVICE)
FAX NUMBER: (501) 771-7194 (CHIEF)

Mr. Allen Polk
3201 W. Roosevelt
Little Rock, Ar. 72204

Mr. Polk,

In response to your request for information, I am forwarding a Freedom Of Information Request to you. In addition, any copies of an arrest disposition report or general report will cost fifty cents for the first page, and twenty five cents for each additional page. If we can be of any further assistance, please let us know.

Sgt. Rick Bibb

*Ex. - D        3 of 4*

Date *March 15, 2011*

Custodian of Records
North Little Rock Police Department
200 W. Pershing Blvd.
North Little Rock, AR 72114

RE:  Request for public records under the Arkansas Freedom of Information Act

By this letter, I hereby request access under the Arkansas Freedom of Information Act, AR Code Ann. 25-19-101 et seq., to public records maintained by the North Little Rock Police Department.  I am a citizen of the State of Arkansas and can be contacted at the address and telephone number provided.

Name *Allen Polk #1902-11*

Telephone number *501-340-7000*

Email address *N/A*

Mailing address *3201 W. Roosevelt Rd.*

City *Little Rock*         State *Ark*         Zip *72204*

*Mailing Address*

Specifically, I request access to the following records for purposes of inspection and copying: *All records related to an arrest on 2/4/11 and all records related to subsequent detention at Northside Bookin.*
Any and all incident reports, accident reports or any other documentation of your Department's contact with the listed individual or address during a period of time from *2/3/11* to *2/9/11* .

Name *Allen Polk*                         Date of birth *10/1/1966*

Address *7009 Grace Rd., L.R., Ark., 72209*

I further request you make available these records for my inspection and copying within three (3) working days, as the Freedom of Information Act requires.  If you provide copies of the records requested I agree to pay reasonable fees for the copies.

Sincerely,

*Allen Polk*

*Ex. - D*         *4 of 4*





DANNY E. BRADLEY
CHIEF

200 WEST PERSHING BLVD.
NORTH LITTLE ROCK, ARKANSAS 72114-2294

PHONE: (501) 758-1234
FAX NUMBER: (501) 771-7157 (SERVICE)
FAX NUMBER: (501) 771-7194 (CHIEF)

May 04, 2011

Mr. Allen Polk
Pulaski Co. Jail # 1902-11
3201 W. Roosevelt Road
Little Rock, AR  72204

Re: FOIA Request on yourself – Allen Polk

Dear Sir:

The North Little Rock Police Dept. – Records Section reviewed your request for records related to the arrest and criminal history of Allen Polk. We have a general report # 2011-09779 and the arrest and disposition report of 02/04/2011. The cost of these are $2.50. The office hours of the Support Services Division are 7:30 a.m. to 4:30 p.m. Monday thru Friday.

You mentioned in your correspondence that you are representing yourself and are entitled to the information requested under discovery. This should be requested through the Pulaski County Prosecuting Attorney's office, not NLRPD.

As you may or may not know, the North Little Rock Police department does not have a jail. We use the Pulaski County Detention Facilities, so time you spent at Northside book-in would have to be requested from them.

If we can assist you with any further information or you have any questions, please feel free to contact me.

Sincerely,

Janice Jensen, Office Manager-Support Services
North Little Rock Police Department (501) 771-7126

*Ex. – E*        */1/1*



**DANNY E. BRADLEY**
CHIEF



200 WEST PERSHING BLVD.
NORTH LITTLE ROCK, ARKANSAS 72114-2294

PHONE: (501) 758-1234
FAX NUMBER: (501) 771-7157 (SERVICE)
FAX NUMBER: (501) 771-7194 (CHIEF)

May 13, 2011

Mr. Allen Polk
Pulaski Co. Jail # 1902-11
3201 W. Roosevelt Road
Little Rock, AR  72204

Re: payment Report # 2011-09779

Dear Sir:

The North Little Rock Police Dept. – Records Section reviewed your payment options for general report # 2011-09779 and the arrest and disposition report of 02/04/2011. The cost of these is $2.50. We only accept cash or checks for the purchase of these reports, not stamps or credit cards. The office hours of the Support Services Division are 7:30 a.m. to 4:30 p.m. Monday thru Friday.

You mentioned in your previous correspondence that you are representing yourself and are entitled to the information requested under discovery. This should be requested through the Pulaski County Prosecuting Attorney's office, not NLRPD.

I am not aware of which officer transported you to Pulaski Co. Jail; however, any property would have traveled with you to PCJ.

If we can assist you with any further information or you have any questions, please feel free to contact me.

Sincerely,

Janice Jensen, Office Manager-Support Services
North Little Rock Police Department (501) 771-7126

Ex.-F                          1/1



# POLICE DEPARTMENT
## NLR
### NORTH LITTLE ROCK



DANNY E. BRADLEY
CHIEF

200 WEST PERSHING BLVD.
NORTH LITTLE ROCK, ARKANSAS 72114-2294

PHONE: (501) 758-1234
FAX NUMBER: (501) 771-7157 (SERVICE)
FAX NUMBER: (501) 771-7194 (CHIEF)

June 09, 2011

Mr. Allen Polk
Pulaski Co. Jail # 1902-11
3201 W. Roosevelt Road
Little Rock, AR  72204

Re: Transport Officer

Dear Sir:

You made an inquiry of which police officer transported you from Northside Detention Facility to the Pulaski County Detention Facility.

Ofc. M. Hood with NLRPD transported you to Pulaski County.

If we can assist you with any further information or you have any questions, please feel free to contact me.

Sincerely,

Janice Jensen, Office Manager-Support Services
North Little Rock Police Department (501) 771-7126

Ex. - G                    1/11

To; Ms. Janice Jensen
   Office Manager/Support Svcs.
   N. L. R. Police Department
   200 W. Pershing Blvd.
   N. L. R., Ark. 72114-2294

From; Allen Polk
   P.C. J. #1902-11
   3201 W. Roosevelt Rd.
   L.R., Ark. 72204

Re; F.O.I.A. Request Continued ...

Dear Ms. Jensen,                    June 13, 2011
   I'm in receipt of your correspondence dated
June 9 in reference to N.L.R.P.D. Officer M. Hood.
   I appreciate you for sending me that, and I sure
am glad to get his name, because he practically
"RESCUED" me from Northside Intake; they had me
"roped & hogtied" on the floor 'till he showed up
and got me out of there! I really owe him, ya know?

[1 of 2]

Ex.-H                              145

Listen, I understand that Roostside is a division of the Pulaski County S. O. and that records related to my little visit to that place will have to come from them, but as I understand it, (before they recently shut it down, anyway) there were (12) L.R.P.D. Officers working there and (5) N.L.R.P.D. Officers on a regular basis, and I need to know the names of all (5) N.L.R. Officers who worked there, as well as the (12) L.R. Officers if you know them.

In particular, I need to know also who was working there from about 11:00 pm on the night of Feb. 4, 2011, to roughly 1:00 pm on the afternoon of Feb. 5, 2011, which is roughly when Officer Hood picked me up and got me out of there.

I'm enclosing a couple of attachments for your convenience. I've got copies, so you can keep 'em or whatever.

Ma'am, once again, I sure do appreciate your help!

Sincerely, Allen Pol

/ap
Enclo . . . . )
Cc; File . . . )

(2 of 2)

Ex. 14
2/5



Arkansas Democrat-Gazette/RICK McFARLAND

**Sgt. William Stricklin** of the Pulaski County sheriff's office leaves an empty holding cell Monday as officers shut down the Northside Holding Facility in North Little Rock.

# Jail has room, so sheriff shuts down NLR stopover

JESSICA SEAMAN
AND SPENCER WILLEMS
ARKANSAS DEMOCRAT-GAZETTE

With bed space at the county jail regularly available for the first time in six years, the Pulaski County sheriff's office closed its temporary detention center in North Little Rock on Mon-day morning.

But neither Sheriff Doc Holladay nor the chiefs of police in Little Rock and North Little Rock expect the Northside book-in office to stay closed.

"I don't anticipate the closing to be a permanent

See **CLOSED**, Page 4A

# Closed

**• Continued from Page 1A**

thing," said Holladay, who added that he closed the facility so that the 17 Little Rock and North Little Rock officers who man it could go back to their departments. "I would love it to be. We are trying to give relief to local law enforcement."

"I think it has a 50-50 chance of making three weeks," Little Rock Police Chief Stuart Thomas said of the closure. "I appreciate [Holladay's] willingness to try, but I realize, from a practical standpoint, the limitations that he has with capacity right now."

The Pulaski County jail, largest county jail in the state, had been over capacity since 2005, when county officals, citing revenue shortfalls, cut $6 million from the sheriff's office budget. That resulted in layoffs for deputies and cut the jail's capacity 245 beds, to 880.

By moving budgeted funds around, Holladay was able to start 2010 with 1,055 beds, and when the Pulaski County Quorum Court funded an additional 75 beds, he reopened the last of the jail's wings in December and boosted capacity to 1,130 beds. With the jail's population — currently 1,053 — steadily remaining below the maximum capacity since then, the sheriff's office had the opportunity to close the Northside facility, at 315 W. 29th St. in North Little Rock.

The facility is where most people arrested for crimes in Little Rock, North Little Rock and unincorporated parts of Pulaski County are processed. By state law, detainees can only be held there for 23 hours before they post bond, are released with a written court-appearance agreement or are transferred to the county jail. Since 2006, Northside has been manned only by Little Rock and North

Little Rock officers.

"Law enforcement is doing a good job at arresting people," Holladay said. "We need to do the job of keeping them locked up once they are arrested."

Thomas said his department, which currently has 40 vacant positions, will get back the 12 officers who worked at the Northside facility.

"We didn't add officers to [staff Northside]," Thomas said. "We just had to work around it."

How Thomas intends to use the dozen officers will be depend on how long the facility stays closed.

"It is a situation, where, yes, we would love to be able to assign them specifically and permanently to other duties in the department," Thomas said. "For the time being, I think it will be very prudent to keep everybody in position to move back over there if we have to."

North Little Rock Police Chief Danny Bradley said there had been general discus-

sions about Northside closing, before Holladay made his announcement to the police departments Thursday that the facility was closing.

He said the closing did not surprise him but the timing did.

"We prefer to have some advance knowledge of what was going to happen," Bradley said. "Organizationally it is easier for us if we set things up and know in advance that things are going to change."

Bradley's department had five officers working at the facility before it closed. The officers will return to positions they had at before they were sent to Northside. Four will go back to patrol and the other will go back to the department's warrant section, he said.

Even with the five officers back at their original duties, Bradley said, the department may not see that much of a benefit. That's because it will take more time to book offenders at the county jail on West Roosevelt Road in

Little Rock. The county jail is almost eight miles away from Northside, which is in the heart of North Little Rock.

"I'm not convinced that we are going to save a lot of officer time, but, operationally, I think it will probably be better in terms of having one center there where the county takes care of all of the prisoners," Bradley said.

"I hope we receive some benefit in terms of time. But I am really looking at that as kind of an even swap."

Holladay said he is eager to see the county jail's capacity expand beyond 1,130 beds. The Pulaski County Quorum Court earlier this month approved funding for a new $5.3 million, 240-bed addition that will be targeted toward nonviolent offenders. The project is expected to be completed by the fall of 2012, Holladay said.

Once the additional beds are added to the jail, there is a better chance that Northside can be closed for the long term, Thomas said.



Arkansas Democrat-Gazette/RICK McFARLAND

**Pulaski County sheriff's** Sgt. William Stricklin looks over the sign-in books Monday at the Northside Holding Facility in North Little Rock while helping close it down temporarily.

| Office of the | |
|---|---|
| Pulaski | **Official Memorandum** |
| County | **Pulaski County Detention Facility** |
| Sheriff | |

**To:**    Inmate Polk, Allen#1902-11

**From:**    Chief R. Morgan

**Re:**    Response to Letter

**Date:**    February 22, 2011

You were arrested by NLRPD on February 4, 2011 and you remained in their custody during their paperwork processing and identification efforts. On February 5, 2011 at 1:37 p.m., you entered the custody of the Sheriff of Pulaski County under my supervision. On February 8, 2011 at 6:54 a.m., you were taken to NLRDC Video Arraignment by my designee Sgt. M. Briggs well before your 72-hour time allotment expired. Furthermore, Sgt. Briggs has informed me that you were removed from the court room at the order of Judge Hamilton for disrupting his proceedings. Judge Hamilton advised you that he found probable cause for your arrest, and that he was holding you without bond. You then attempted unsuccessfully to argue the constitutionality of your arrest, at which point you were returned to your cell.

You have also filed grievances with my grievance office. I will take this time to inform you that Judicial Orders, Laws, Policies, and Procedures are all non-grievable issues. Should you have any further questions regarding what you can and cannot do inside of the facility, I refer you to the inmate handbook that I have provided for you inside of the unit you are housed in.

Janice,
    We already know I was arrested and put in Northside at around 11:00 pm on 2/4 and that they show me booked in over here at 1:37, so we're talking about roughly (14) hours at Northside.
    I need a list of everybody there during that time frame.

Ex. H          5 of 5